In re Heather C. WESP, Plaintiff,

v.

David E. EVERSON, as personal representative of the Estate of Frank T. Brewer, and as personal representative of the Estate of Cheryl A. Brewer, Defendant.

Nos. 01SA100, 01SA98.

Supreme Court of Colorado,
En Banc.

Oct. 15, 2001.

The Easley Law Firm, P.C., Jeffrey D. Easley, San Diego, CA, Attorneys for Plaintiff.

Paul A. Prendergast, Janelle M. Oswald, Littleton, CO, Attorneys for Defendant David E. Everson.

Justice BENDER delivered the Opinion of the Court.

## I. INTRODUCTION

This original proceeding involves questions about the application of the attorney-client privilege and whether a pretrial hearing should be held before permitting one party to call opposing counsel as a witness at trial.

Plaintiff Heather Wesp, the respondent in this court, sought damages in tort against her mother and step-father, Cheryl and Frank Brewer, based on allegations that Frank Brewer had sexually abused her. Criminal charges were also filed based on the same allegations. After writing suicide letters to family and friends, both Brewers committed suicide. The criminal charges pending against Frank Brewer were dismissed and the personal representative of both Brewer estates was substituted as the party-defendant in the civil suit. Thereafter, the personal representative hired Frank Brewer's criminal defense attorneys to represent both estates on Wesp's claims. The personal representative is the petitioner in this court.

During discovery, Wesp requested information from the defendant that the defendant claims is protected by operation of the attorney-client privilege. Separately, Wesp also endorsed Frank Brewer's criminal defense attorneys as witnesses for the upcoming trial.

In a series of rulings, the district court held that: (1) the attorney-client privilege was waived by the Brewers' suicide letters; (2) the attorney-client privilege did not survive the death of Frank Brewer; (3) the testamentary exception to the attorney-client privilege may apply; (4) the privilege should be pierced because the exclusion at trial of testimony about communications between Frank Brewer and his criminal defense attorneys "would work a manifest injustice"; and (5) it would not hold a pretrial hearing or make a pretrial determination about whether the defendant's attorneys, formerly Frank Brewer's criminal defense attorneys, could be called as witnesses at trial.

The defendant in the trial court, the personal representative of the Brewers' estates, brought two original petitions claiming that the trial court exceeded its jurisdiction in making the above rulings. We issued orders to show cause and now join both actions in this opinion.

We hold that the Brewers' suicide letters did not waive the protections of the attorney-client privilege because the letters disclosed attorney-client communications that both parties agree are not protected since they were made in the presence of a third party. We hold that the attorney-client privilege generally survives the death of the client and that the testamentary exception to the privilege does not apply in this case. We also hold that the attorney-client privilege may not be pierced to correct a manifest injustice because the creation of such an exception would frustrate the purposes of the privilege and is not supported by precedent. Lastly, we hold that the trial court abused its discretion by refusing to conduct a pretrial hearing and reach a pretrial decision about whether Frank Brewer's criminal defense attorneys, who now represent the defendant, may be called as witnesses at trial. Hence, we make both rules absolute and direct the district court to hold a pretrial hearing on the question of whether the defense attorneys may be called to testify at trial.

## II. JURISDICTION

An original proceeding under C.A.R. 21 is an extraordinary remedy that is limited in purpose and availability. *People v. Dist. Court,* 868 P.2d 400, 403 (Colo.1994). It is a proper remedy in cases where the trial court has abused its discretion and where an appellate remedy would not be adequate. *Halaby, McCrea & Cross v. Hoffman,* 831 P.2d 902, 905 (Colo.1992). We generally elect to hear cases under C.A.R. 21 that raise issues of significant public importance that we have not yet considered. *City & County of Denver v. Dist. Court,* 939 P.2d 1353, 1361 (Colo.1997).

In the present case, the trial court has issued an order compelling the defendant to disclose communications that he contends are protected by privilege. Post-trial review would not provide adequate relief since any privileged communications would have already been revealed by the time the case reached an appellate court. *See People v. Bloom,* 193 N.Y. 1, 85 N.E. 824, 826 (1908) ("[W]hen a secret is out, it is out for all time, and cannot be caught again like a bird, and

put back in its cage."). Further, because of the trial court's order refusing to conduct a pretrial hearing on whether Wesp may be permitted to call the defendant's attorneys as witnesses at trial, defense counsel has been forced to withdraw as trial counsel. The scope of the attorney-client privilege and the ability of a party to force opposing counsel to withdraw are issues of great significance to our legal system. Therefore, we exercise original jurisdiction in this case.

## III. FACTS AND PROCEEDINGS BELOW

In July of 1998, Heather Wesp reported to the police that her step-father, Frank Brewer, had sexually abused her during her childhood. Anticipating that criminal charges would be brought, Frank Brewer hired attorney Paul Prendergast and his associate, Janelle Oswald, to defend him.

Frank Brewer was charged with nineteen counts of aggravated incest and sexual assault. Prendergast discussed possible plea bargains with the district attorney's office but no agreement was reached.

The defendant alleges that, during the course of Prendergast's representation of Frank Brewer, Frank Brewer spoke on the telephone and met privately with Prendergast ("private meetings"). Additionally, Prendergast met with both Frank and Cheryl Brewer on a Saturday in November ("joint meeting"). At the joint meeting, Prendergast told Frank Brewer of the criminal charges that had been filed against Frank Brewer, of the penalties associated with these charges, and of a possible plea agreement. According to Cheryl Brewer, Prendergast also recommended that Frank Brewer accept the plea bargain offered by the district attorney.

In the fall of 1998, Wesp brought civil claims seeking money damages against both Frank and Cheryl Brewer. Initially, Prendergast and Oswald did not represent either Frank or Cheryl Brewer in the civil case.

Approximately one week after the criminal charges were brought against Frank Brewer, the Brewers both prepared holographic

wills.[1] Additionally, the Brewers wrote letters containing denials that Frank Brewer had done the acts of which Wesp had accused him and provided explanations for their decisions to commit suicide. In giving these explanations, the Brewers related some of the information and advice about the criminal case that had been given to Frank Brewer by Prendergast at the joint meeting. For instance, in one letter to a friend, Cheryl Brewer wrote that "[t]he lawyer said with our record + Heather + Kerry [to] testify ... that it would be very, very hard to disprove this. The Lawyer wants Frank to plea + go to jail before Christmas."[2] After writing these letters, the Brewers committed suicide.

The personal representative of the estates of Frank and Cheryl Brewer was then substituted as the defendant in the civil action. Several months later, Prendergast and Oswald entered their appearance as counsel for the defendant in this civil case.

Subsequently, Wesp gave notice that she intended to depose Prendergast,[3] who filed a Motion for a Protective Order to quash the deposition. The trial court denied the motion, holding in essence that the attorney-client privilege does not survive death. The trial court also suggested that the testamentary exception would apply and that Frank Brewer waived any privilege with his suicide letters.[4]

Wesp's counsel deposed Prendergast and Oswald. Both refused to answer almost all questions, citing attorney-client privilege and the work product doctrine.

Wesp endorsed both Prendergast and Oswald as witnesses at trial. In response, the defendant requested that the trial court conduct a pretrial hearing, pursuant to *Williams v. District Court*, 700 P.2d 549 (Colo.1985), to make the requisite findings of fact and conclusions of law necessary to permit Wesp to call defense counsel as witnesses at trial.

At the trial court's request, Wesp submitted an offer of proof. However, her offer of proof did not state the specific content of the defense attorneys' anticipated testimony. Instead, it contained general allegations and little supportive detail.[5] Plaintiff argued that

---

1. The Brewers each bequeathed only $1 to Wesp.

2. From the letters submitted to this court, the following additional excerpts also describe the information conveyed by Prendergast at the joint meeting:

 Last Saturday, Frank + I talked to Paul, Frank's attorney and he told us the charges she had filed. There were 22 counts and more than half had sentences of 45 years. The judge that would be hearing the case doesn't care if you are not guilty or not, if you are accused, you are guilty. Paul wanted Frank to plea to a settlement. He would plead guilty and at the least, he was looking at 12 years. With him pleading guilty, Heather would easily win the civil suit.
 Letter to Cheryl Brewer's father, from Cheryl Brewer.
 If we tried to go to trial, the new judge that will be in charge of the case is one that is looking to put abusers away right now. The lawyer said he would not have a chance. There are 22 counts + most of them carry 45 years.
 Letter to friend, from Cheryl Brewer.
 The attorney we have told us the judge that would hear the case wants to lock up and through [sic] away the key. If Frank was convicted which would be very easy because of our other record, she would win the civil suit. So Frank would be in jail + I would have nothing.

Letter to neighbors, written by Cheryl Brewer and signed by both Brewers.
 I hate to go but after Sat. with the lawyer, with the penalties I'm not pleading guilty to something I did not do and I'm not giving it all to lawyers and Heather and being broke or leaving Cheryl with nothing.
Letter to Frank Brewer's brother, from Frank Brewer.

3. Later, Wesp notified the defendant that she wished to depose Oswald as well.

4. Specifically, the trial court stated:

 While a client is living, an attorney could not testify as to privileged communications without the client's consent. However, the rule is otherwise after death in regard to matters in dispute. In addition, statements made initially in confidence lose the shield of privilege if subsequently disclosed to third parties.
 Here, the dispute is in part related to the estate administration and the decedent Frank Brewer left written notes and other documents discussing at least some of his conversations with counsel.... [F]or purposes of discovery, the Court finds and concludes that the privilege has been waived....
 Trial Court Order, November 8, 1999.

5. The heart of Wesp's offer of proof is contained in paragraph (8), which states:

Prendergast and Oswald would have knowledge of Frank Brewer's state of mind at the time of his suicide. However, Wesp provided no explanation as to why Frank Brewer's state of mind at the time of his suicide is relevant to Wesp's tort claims.

A second trial court judge[6] issued a second ruling which partially qualified the first judge's ruling that the attorney-client privilege did not survive the death of Frank Brewer, stating, "[T]he attorney-client privilege may survive the death of the client in some instances." However, the trial court ultimately concluded that "the exclusion of such testimony [about attorney-client communications] in this case would work a manifest injustice."

The trial court also declined to conduct a pretrial *Williams* hearing, ruling that the *Williams* analysis could be performed at trial when Prendergast and Oswald were called to testify. Because the trial court refused to conduct the pretrial hearing, both attorneys were forced to withdraw as trial counsel for the defendant.

Thereafter, the defendant sought extraordinary relief from this court.

## IV. ATTORNEY–CLIENT PRIVILEGE

### A. General Principles

■ We begin our analysis by discussing the principles of the attorney-client privilege. This privilege is codified in Colorado by statute and operates to protect communications between attorney and client relating to legal advice. § 13–90–107(1)(b), 5 C.R.S. (2001);[7] *Gordon v. Boyles*, 9 P.3d 1106, 1123 (Colo. 2000).

> Paul Prendergast and Janelle Oswald have knowledge and information regarding (a) communications between their office and Frank Brewer and/or Cheryl Brewer, (b) communications between their office and the District Attorney's office, (c) Frank Brewer's behavior, and (d) Cheryl Brewer's behavior.

6. The original presiding trial court judge retired and the case was reassigned to the second trial court judge.

7. "An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given

### 1. Purposes

In order to navigate within our legal system, lay people frequently require the assistance of attorneys. Attorneys are unable to provide clients with effective legal advice unless the clients reveal all pertinent facts, no matter how embarrassing or inculpating these facts may be. Open and honest communication between attorney and client thus furthers the attorney's ability to serve her client's interests. Absent assurances that communications will remain confidential, clients may be reluctant or unwilling to seek legal advice or to confide fully in their attorney. Thus, the right of parties within our justice system to consult professional legal experts is rendered meaningless unless communications between attorney and client are ordinarily protected from later disclosure without client consent. As early as 1833, courts extolled the virtues of protecting attorney-client communications because the privilege ultimately furthers the rule of law and the administration of justice:

> [S]o numerous and complex are the laws by which the rights and duties of citizens are governed, so important is it that they should be permitted to avail themselves of the superior skill and learning of those who are sanctioned by the law as its ministers and expounders ... that the law has considered it the wisest policy to encourage and sanction this confidence [between attorney and client], by requiring that on such facts [communicated in confidence,] the mouth of the attorney shall be for ever [sic] sealed.

*Hatton v. Robinson*, 31 Mass. 416, 422 (1834).[8]

thereon in the course of professional employment...."

8. Over the years, these ideas have been reiterated by numerous courts and commentators. *See, e.g., United States v. Standard Oil Co.,* 136 F.Supp. 345, 355 (S.D.N.Y.1955) (stating that "the free flow of information from client to attorney, so vital to our system of justice, will be irreparably damaged [if attorney-client communications are not protected]," and that "confidences communicated by a client to his attorney must remain inviolate for all time if the public is to have reverence for the law and confidence in its guardians"); 1 Charles McCormick, *McCor-*

Because the attorney-client privilege may frustrate the fact-finding process, it exists in constant tension with the judicial system's truth-seeking goals. However, that tension "is the price that society must pay for the availability of justice to every citizen, which is the value that the privilege is designed to ensure." *In re John Doe Grand Jury Investigation*, 408 Mass. 480, 562 N.E.2d 69, 70 (1990). The overall social benefits of the privilege outweigh any harm that may result in a particular case from the privilege's application. *Id.* Further, the harshness of the operation of the privilege is softened by a number of exceptions and by the doctrine of waiver, all of which are consistent with the goals of the privilege.

Colorado has explicitly recognized many of the principles and policies just described. For instance, we have acknowledged that the privilege is "rooted in the principle that candid and open discussion by the client to the attorney without fear of disclosure will promote the orderly administration of justice." *A v. Dist. Court*, 191 Colo. 10, 22, 550 P.2d 315, 324 (1976). We have stated that "[o]bservance of the obligation to hold inviolate the confidences developed in the attorney-client relationship" both "facilitates the full development of facts essential to proper representation of the client" and "encourages the general public to seek early legal assistance." *Nat'l Farmers Union Prop. & Cas. Co. v. Dist. Court*, 718 P.2d 1044, 1047 (Colo. 1986). Additionally, we have recognized the doctrine of waiver and several exceptions to the privilege, some of which are discussed in greater detail below.

### 2. The Requirement of Confidentiality

■ Because the purpose of the privilege is to encourage clients to confide in their attorneys, it applies only "to statements made in circumstances giving rise to a reasonable expectation that the statements will be treated as confidential." *Lanari v. People*, 827 P.2d 495, 499 (Colo.1992); *see also D.A.S. v. People*, 863 P.2d 291, 295 (Colo. 1993) (noting that there must be circumstances indicating the intention of secrecy for a communication to be privileged); *People v. Tippett*, 733 P.2d 1183, 1192 (Colo.1987) (stating that communications must be "private or secret" to be privileged).

■ If a client communication is made to an attorney in the presence of a third party, then the communication is ordinarily not considered confidential. *D.A.S.*, 863 P.2d at 295; McCormick, *supra*, § 91, at 364 ("[T]he presence of a casual disinterested third person within hearing to the client's knowledge would demonstrate that the communication was not intended to be confidential."). Since confidentiality is one of the elements that must be shown in order for the attorney-client privilege to attach, a communication made in the presence of a third party will not ordinarily receive the protection of the attorney-client privilege.[9]

■ No blanket privilege for all attorney-client communications exists. Rather, the privilege must be claimed with respect to each specific communication and, in deciding whether the privilege attaches, a trial court must examine each communication independently.[10] Thus, a communication between attorney and client that satisfies the requi-

---

mick on Evidence § 91, at 364 (John W. Strong ed.1999); 8 John Henry Wigmore, *Wigmore on Evidence* § 2291 (1961).

9. This rule is not absolute. The presence of certain employees or agents of the attorney does not defeat the privilege. § 13–90–107(1)(b). Also, statements made in the presence of a co-defendant at a meeting with a joint attorney concerning a matter of common interest to a joint defense may be protected. *Gordon*, 9 P.3d at 1124.

10. The parties in this case did not raise the issue of whether the attorney-client privilege was properly asserted by defense counsel at their depositions, and deposition transcripts were not part of the record in this proceeding. We note, however, that the appropriate way to assert the privilege is on a question-by-question basis and not by a general assertion of the privilege. *Losavio v. Dist. Court*, 188 Colo. 127, 134–35, 533 P.2d 32, 36 (1975); *People v. Ensor*, 632 P.2d 641, 642 (Colo.App.1981); C.R.C.P. 26.2(a)(6) ("When a party withholds information required to be disclosed by claiming that it is privileged ... the party shall make the claim expressly and shall describe the nature of the ... communications ... in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.").

sites of the privilege will be protected, while a separate attorney-client communication that does not satisfy the privilege's criteria will not be protected. The burden of establishing that a particular communication is privileged rests on the party asserting the privilege. *D.A.S.*, 863 P.2d at 294.

### 3. Waiver

The client may impliedly or expressly waive the privilege that attaches to a protected communication. *Miller v. Dist. Court,* 737 P.2d 834, 838 (Colo.1987). To prove an implied waiver, there must be evidence showing that the privilege holder, "by words or conduct, has impliedly forsaken his claim of confidentiality with respect to the communication in question." *Id.* at 838 (citing *Clark v. Dist. Court,* 668 P.2d 3, 8 (Colo. 1983)). Waiver may occur in a variety of situations, including when a party places in issue a confidential communication going directly to a claim or defense, or when a witness testifies as to the communication without objection by the privilege-holder. *See Lanari,* 827 P.2d at 499–500; *Mountain States Tel. & Tel. Co. v. DiFede,* 780 P.2d 533, 543 (Colo.1989). The burden of establishing such a waiver rests with the party seeking to overcome the privilege. *Miller,* 737 P.2d at 838.

As discussed, attorney-client communications made in the presence of a third party do not ordinarily receive the protection of the privilege, since they do not meet the confidentiality requirement. In contrast, if a communication to which the privilege has previously attached is subsequently disclosed to a third party, then the protection afforded by the privilege is impliedly waived. *Denver*

*Post Corp. v. Univ. of Colo.,* 739 P.2d 874, 881 (Colo.App.1987); McCormick, *supra,* § 93 at 371 & 377; Charles W. Wolfram, *Modern Legal Ethics* §§ 6.3.7 & 6.4.4 (1986). The rationale for this rule of waiver is that the subsequent disclosure of the communication is inconsistent with the confidentiality that must be maintained in order for the privilege to continue to apply. *Id.* § 6.4.4; 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 503.40 (Joseph M. McLaughlin ed.2001).

The difference between situations where no privilege attaches and situations where a privilege is waived becomes important because some courts deem a waiver of the privilege with respect to a particular communication to operate as a waiver of the privilege with respect to all attorney-client communications on the same subject.[11]

On the other hand, if the privilege never arises with respect to specific attorney-client communications, then we never reach the question of waiver. In such cases, as a matter of logic, there can be no waiver of the privilege because the statements disclosed were not privileged in the first instance.

### B. Communications Between Frank Brewer And His Criminal Defense Attorneys

In this case, the defendant argues that any statements made by Frank Brewer at the joint meeting are *not* privileged because these communications were made in the presence of a third party, Cheryl Brewer.[12] Hence, the defendant contends that the subsequent disclosure of the statements made at the joint meeting did not constitute a waiver of the privilege attaching

11. *See, e.g., In re Grand Jury Proceedings October 12, 1995,* 78 F.3d 251, 255 (6th Cir.1996) (discussing whether "subject matter" should be defined narrowly or broadly); *In re Estate of Baker,* 139 Misc.2d 573, 528 N.Y.S.2d 470, 473 (N.Y.Surr.Ct.1988). *But see, e.g., United States v. Aronoff,* 466 F.Supp. 855, 862–63 (S.D.N.Y. 1979); *Goldman, Sachs & Co. v. Blondis,* 412 F.Supp. 286, 289 (N.D.Ill.1976) (limiting the scope of a waiver based on fairness concerns).

12. The defendant also argues that the communications made at the joint meeting were not privileged because the suicide letters reveal that only underlying facts of the case were discussed at the

joint meeting. We agree with defendant that any underlying facts mentioned in a communication do not become privileged merely because they are incorporated into a communication to or from an attorney. *Gordon,* 9 P.3d at 1124. However, the defendant's argument ignores the fact that at least some of the statements made at the joint meeting were not underlying facts. For instance, Cheryl Brewer states in one of her suicide letters that "Paul wanted Frank to plea to a settlement." A lawyer's recommendation that his client take a plea bargain is not an underlying fact.

to any separate communications made between Frank Brewer and his criminal defense attorneys. The defendant argues that any confidential communications occurring between Frank Brewer and his attorneys at their private meetings, which happened outside the presence of a third party, remain privileged and protected despite the suicide letters.

Wesp does not dispute the defendant's contention that the statements made at the joint meeting are not protected by the attorney-client privilege.[13] In fact, she states in her offer of proof that "the subject of any communications among Frank Brewer, his attorney, and Cheryl Brewer were never privileged from disclosure." Additionally, she argues to this court that "[t]here can be no denying [that] much of the information known by Prendergast and Oswald is far outside any recognized privilege [including] information about conversations with Cheryl Brewer ... [and] information about conversations with Frank Brewer in the presence of third parties." Thus, Wesp concedes that any statements made at the joint meeting are not privileged.

Wesp claims, however, that Frank Brewer expressly waived all protection of the attorney-client privilege because the suicide letters disclose communications made at the joint meeting. She argues that statements made in the Brewers' suicide letters operate as a waiver of other communications (such as those made between Frank Brewer and his attorneys at private meetings) which would have been privileged absent the suicide letters and the statements made therein. We disagree.

Wesp's argument omits the necessary first step of finding that a privilege exists for communications that occurred at the joint meeting and moves directly to the second step of finding that the privilege has been waived. As a matter of logic, one may not waive a privilege when a privilege does not exist. Wesp's concession that no privilege attached to statements made at the joint meeting defeats her ultimate argument that the suicide letters operate as a waiver of privileged communications.[14]

 Because the communications made at the joint meeting were not privileged, it follows that those communications are discoverable.[15] Absent proof of another basis to pierce the protection of the attorney-client privilege, communications between Frank Brewer and his attorneys occurring at other times and places remain privileged so long as the party asserting the privilege can demonstrate that the requirements of the privilege are satisfied.

## C. Effect Of The Death Of The Client

Having decided that the communications made at the joint meeting were not privi-

13. Because the parties do not dispute whether the attorney-client communications made in Cheryl Brewer's presence are privileged, we decline to address this issue. We observe, however, that the effect of a spouse's presence on a communication between attorney and client is not entirely clear. *See, e.g., United States v. Rothberg*, 896 F.Supp. 450, 454 n. 7 (E.D.Pa.1995) (noting without discussion that the trial court held that the privilege applies to statements made in a third party spouse's presence); *Charal v. Pierce*, No. CV810042, 1981 U.S. Dist. LEXIS 17497, at *28–30 (E.D.N.Y. Nov. 3, 1981) (concluding that a conversation between attorney and client, in the presence of the client's spouse, was privileged because the client reasonably understood the conference to be confidential and the spouse's presence was reasonably necessary for the protection of the client's interests); *People v. Allen*, 104 Misc.2d 136, 427 N.Y.S.2d 698, 699–700 (N.Y.App.Div.1980) (holding that a three-way conversation among an attorney, his client, and the client's spouse was not privileged).

14. In further support of our conclusion, we note that there has been no claim that Cheryl Brewer, the author of the majority of the relevant portions of the suicide letters, had knowledge of the content of the communications made between Frank Brewer and his attorneys outside of her presence. To permit Cheryl Brewer to waive the privilege attaching to private attorney-client communications of which she had no knowledge would frustrate the goals of the attorney-client privilege.

15. Certain other types of information communicated between attorney and client are also not protected by the privilege and may be discovered. For instance, an attorney generally may not refuse to answer questions about the identity of a client and fee arrangements. *Losavio*, 188 Colo. at 133, 533 P.2d at 35; *In re Marriage of Schneider*, 831 P.2d 919, 921 (Colo.App.1992).

leged and that the Brewers' suicide letters did not destroy any existing privilege applicable to other communications, we turn to the question of the effect of Frank Brewer's death on the attorney-client privilege.

The precedents uniformly hold or presume that the attorney-client privilege ordinarily survives the death of the client. *See, e.g., Mayberry v. Indiana,* 670 N.E.2d 1262, 1267 n. 5 (Ind.1996); *John Doe Grand Jury Investigation,* 562 N.E.2d at 70. The Supreme Court has noted that the very existence of the testamentary exception, discussed in greater detail below, presumes that the privilege must survive the death of the client. *Swidler & Berlin v. United States,* 524 U.S. 399, 404, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998). The *Swidler* Court reasoned that survival of the privilege is consistent with the privilege's policy, because "[k]nowing that communications will remain confidential even after death encourages the client to communicate fully and frankly with counsel.... Clients may be concerned about reputation, civil liability, or possible harm to friends or family. Posthumous disclosure of such communications may be as feared as disclosure during the client's lifetime." *Id.* at 407, 118 S.Ct. 2081. These considerations led the *Swidler* Court to hold that the privilege survives death.

We find this reasoning to be persuasive. Therefore, we hold that any privileged communications between Frank Brewer and his attorneys remain privileged after his death.

### D. Exceptions To The Rule Of Attorney–Client Privilege

There are several exceptions to the rule of attorney-client privilege, including the testamentary exception.[16] In this case, the trial court suggested that the testamentary exception applies and that the attorney-client privilege may be pierced to prevent a "manifest injustice." We hold that the testamentary exception does not apply. We decline to create a manifest injustice exception to the rule of attorney-client privilege because precedent does not support such an exception and it would undermine the purposes of the privilege.

#### 1. The Testamentary Exception

The testamentary exception permits an attorney to reveal certain types of communications in special circumstances. Specifically, the attorney who drafted the will of a deceased client may disclose attorney-client communications concerning the will and transactions leading to its execution in a suit between the testator's heirs, devisees, or other parties who claim by succession from the testator. McCormick, *supra,* § 94; Wigmore, *supra,* § 2314; 81 Am.Jur.2d, *Witnesses* § 389 (2000). The rationale for this exception is that it furthers the client's testamentary intent. *Swidler,* 524 U.S. at 405, 118 S.Ct. 2081 (citing *Glover v. Patten,* 165 U.S. 394, 407–408, 17 S.Ct. 411, 41 L.Ed. 760 (1897)); Wigmore, *supra,* § 2314.

Colorado recognizes the testamentary exception. *See Denver Nat'l Bank v. McLagan,* 133 Colo. 487, 491, 298 P.2d 386, 388 (1956); *In re Estate of Shapter,* 35 Colo. 578, 587, 85 P. 688, 691 (1905). In *Shapter,* we rejected an argument that an attorney could not testify about client communications relating to the deceased client's will, stating that "after [the client's] death, and when the will is presented for probate, we see no reason why ... the attorney should not be allowed to testify as to directions given to him by the testator so that it may appear whether the instrument presented for probate is or is not the will of the alleged

---

16. Another recognized exception to the rule of attorney-client privilege is the crime-fraud exception, which Wesp now argues applies to this case. Pursuant to this exception, communications between attorney and client are not privileged if they are made for the purpose of aiding the commission of a future or present continuing crime. *Law Offices of Bernard D. Morley, P.C. v. MacFarlane,* 647 P.2d 1215, 1220 (Colo.1982). The party asserting that the privilege is pierced by the crime-fraud exception must make a prima facie showing that provides a foundation in fact for the assertion of ongoing or future criminal conduct. *Caldwell v. Dist. Court,* 644 P.2d 26, 33 (Colo.1982). According to the record presented to us by the parties, Wesp did not raise this argument to the trial court and the trial court did not rule on the applicability of this exception. Hence, we decline to address this argument and express no opinion on its merits.

testator." *Shapter*, 35 Colo. at 587, 85 P. at 691 (internal quotation omitted). In *Denver National Bank*, we stated that numerous decisions hold that the testamentary exception permits an attorney who writes a will to testify, after the testator's death, about attorney-client communications related to the execution and validity of the will. *Denver Nat'l Bank*, 133 Colo. at 491, 298 P.2d at 388.

▪ Wesp claims that the testamentary exception applies because this case involves litigation among the heirs and devisees of Prendergast's client. We are not persuaded. Prendergast and Oswald did not prepare the Brewers' wills. This case is not a will contest case and Wesp does not attempt to claim by succession. Instead, she stands as a potential tort claimant against her mother and step-father's estates. Hence, the testamentary exception does not apply.

Additionally, we note that application of the exception here would be inconsistent with the exception's purpose of furthering the testator's intent. The Brewers, through their suicide letters, claimed that Frank Brewer was not guilty of the crimes with which he was charged. Further, the Brewers stated that their desire was to have their personal representative, the defendant here, fight Wesp's tort claims.

### 2. Consideration Of Manifest Injustice

▪ The trial court ruled that the attorney-client privilege may be pierced if the application of the privilege results in a manifest injustice. Our research discloses neither legal precedent nor authority that supports the existence of any such exception to the rule of attorney-client privilege. Absent legislative direction to the contrary, we decline to read into the privilege such an exception which appears at odds with the purposes of the privilege.

The goal of the privilege is to encourage clients to confide all pertinent information in their attorneys to ensure the orderly administration of justice. Piercing the protection of the attorney-client privilege to prevent a manifest injustice could have far-reaching consequences to our judicial system. Such a rule would discourage clients from confiding

in their attorneys or from seeking legal advice in the first instance. If clients lack the confidence in their attorneys to inform them of all relevant information, then attorneys may be unable to advise and assist clients effectively in a multitude of situations, including those where clients seek legal advice in order to ensure compliance with the law.

The Supreme Court pointed out the benefits of a privilege whose application is certain and predictable:

[I]f the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.

*Upjohn Co. v. United States*, 449 U.S. 383, 393, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The Supreme Court's concerns are relevant here.

If the attorney-client privilege could be pierced on the basis of an unpredictable manifest injustice standard, then this exception would swallow the protections of the privilege and undermine its purpose. Hence, we hold that the trial court erred to the extent that it recognized and applied a manifest injustice exception to this case.

### V. COUNSEL AS WITNESSES

▪ Next, we address the trial court's refusal to conduct a pretrial hearing to determine whether Prendergast and Oswald may be called as witnesses at trial.

We begin our analysis by reciting the standards, set forth in *Williams v. District Court*, 700 P.2d 549 (Colo.1985), which guide trial courts' determinations about whether an attorney for one party may be called by an opposing attorney to testify at trial. We recognized, in *Williams*, that a preliminary showing is not ordinarily required to subpoena a witness to testify at trial. *Id.* at 554. "Such is not the case, however, when the prosecution subpoenas the accused's attorney to give testimony adverse to his client in a pending criminal prosecution." *Id.*

We expressed concern that a subpoena commanding opposing counsel to be a trial witness could be used as a tactic to force opposing counsel to withdraw. *Id.* at 554–55. Therefore, we held that a subpoena served upon an opponent's attorney can withstand a motion to quash only if the non-moving party demonstrates on the record that: (1) the opposing counsel's testimony will be adverse to her client; (2) the evidence sought will likely be admissible under the controlling rules of evidence; and (3) there is a "compelling need for such evidence, which need cannot be satisfied by some other source." *Id.* at 555–56. We emphasized that the first requirement of adversity cannot be inferred from the mere fact that the moving party subpoenaed opposing counsel to testify at trial. The moving party bears the burden of demonstrating actual adversity. *Id.* at 555 n. 8.

In a subsequent case, *Taylor v. Grogan,* 900 P.2d 60, 62 n. 5 (Colo.1995), we extended the *Williams* test to civil cases.

Wesp argues that there is no precedent requiring a court to perform the *Williams* analysis before trial. On the other hand, the defendant argues that the reasoning of *Williams* requires the trial court always conduct a pretrial hearing. The defendant asserts that if the *Williams* analysis is not performed well before trial, then the subpoenaed attorney will be forced to withdraw from representation of her client irrespective of whether she will ultimately be required to testify under *Williams.* Such a result, defendant argues, is inconsistent with the concerns that spurred the development of the *Williams* factors in the first place.

We reiterate the *Williams* court's concern that endorsing opposing counsel as a witness at trial could be a "device for forcing a particular lawyer to terminate his representation" of her client. *Williams,* 700 P.2d at 554. In at least some cases, this concern cannot be addressed unless the *Williams* analysis is performed well in advance of trial. There are times when application of the *Williams* test at trial, after the attorney has withdrawn, would work a marked injustice. *Id.* at 558 (stating that, when it was unclear that the attorney's testimony would be necessary under the third prong of the *Williams* test, to "require [the attorney] to make himself available as a possible ... witness for the prosecution would be tantamount to unnecessarily terminating the lawyer-client relationship ... a result that offers no countervailing benefits to the administration of justice and could seriously disadvantage the petitioner").

■ Therefore, in the typical case, absent exceptional circumstances, a trial court should apply the *Williams* test and render a decision about whether an attorney can be called as a witness pretrial. Following this procedure will, at least to some extent, frustrate the ability of one party to subpoena opposing counsel to testify as a trial tactic. In some cases, a trial court will be unable to render a pretrial decision about whether an attorney may be called to testify without conducting a pretrial hearing to determine whether a party satisfies her burden under *Williams.* Such is the case here.

The facts of this case require the trial court to conduct a pretrial hearing to determine whether Wesp can satisfy her burden under *Williams.* Wesp's offer of proof describes the testimony to be elicited from Prendergast and Oswald in vague terms. It provides no explanation of how the anticipated testimony of the attorneys will be adverse to the interests of either of the Brewers' estates. Because it does not describe the testimony with any specificity, it also fails to demonstrate either that such testimony will be admissible or that it satisfies a compelling need that cannot be met from other sources.

Thus, the documents submitted to us by the parties indicate that Wesp is merely speculating that Prendergast and Oswald have information which they may be called to testify about under *Williams.* Defense counsel should not be forced to withdraw on the basis of vague claims that they are material witnesses. *See id.* at 558 n. 10. We note that Wesp has described no special circumstances which would require application of the *Williams* test at trial. Therefore, we hold that a pretrial hearing must be conducted by the trial court to apply the *Williams* test and a pretrial decision must be reached

about whether Prendergast and Oswald may be called to testify at trial.

## VI. CONCLUSION

Because the parties agree that communications made at the joint meeting were not protected by the attorney-client privilege, we conclude that the Brewers' suicide letters did not waive any privilege that may apply to communications made between Frank Brewer and his attorneys at their private meetings. Frank Brewer's privilege survives his death and the testamentary exception does not apply in this case. Therefore, absent sufficient proof of an exception to the privilege or a waiver of the privilege, communications between Frank Brewer and his attorneys not occurring at the joint meeting remain privileged.

Further, the trial court is ordered to conduct a pretrial hearing and reach a pretrial decision about whether Wesp can meet the burden imposed on her under *Williams*.

We therefore make absolute both orders to show cause and vacate the trial court orders which hold that the privilege does not survive death, the testamentary exception applies, the suicide letters waived any privilege, and the privilege can be pierced to prevent a manifest injustice. Additionally, we direct the trial court to conduct a pretrial *Williams* hearing and make a pretrial determination about whether Prendergast and Oswald may be called as witnesses at trial.