In re: Plaintiff: The PEOPLE
of the State of Colorado,

v.

Defendant: Robert R. TURNER, Jr.

No. 04SA178.

Supreme Court of Colorado.

March 28, 2005.

Molly Chilson, Salida, for Petitioner, Alliance Against Domestic Abuse.

Cynthia Sheehan, Jonathan D. Reppucci, Denver, for Defendant.

Julie Kunce Field, Fort Collins, for Amici Curiae Colorado Coalition Against Domestic Violence, Colorado Coalition Against Sexual Assault, Colorado Organization for Victim Assistance, National Coalition Against Domestic Violence, National Network to End Domestic Violence, National Center on Domestic and Sexual Violence, Domestic Violence Legal Empowerment Appeals Project and 35 other individuals and organizations.

Pamela A. Dayton, Denver, Esteban A. Martinez, Northglenn, for Amicus Curiae Colorado Criminal Defense Bar.

Miles Madorin, Staff Attorney, Denver, for Amicus Curiae Colorado District Attorney's Council.

KOURLIS, Justice.

In this original proceeding pursuant to C.A.R. 21, the Alliance Against Domestic Abuse (the "Alliance") seeks reversal of a Chaffee County Court pretrial order compelling the Alliance to provide certain documents under a subpoena *duces tecum* relating to M.P. The subpoena was issued by the defendant, Robert Turner Jr., who is charged with domestic violence against his girlfriend, M.P. The Alliance moved to quash the subpoena, and the defendant moved to compel production. The county court held an evidentiary hearing, and ultimately ordered the Alliance to produce a broad outline of any assistance provided to M.P. The court reasoned that the victim-advocate privilege set forth in section 13–90–107, C.R.S. (2004) protects only "communications" from the victim to the victim advocate, and not advice or assistance given by the victim advocate in return.

The Alliance petitioned us for issuance of a Rule to Show Cause, which we granted. We now make that Rule absolute. We hold that the victim-advocate privilege attaches to records of assistance provided by the victim advocate because those records are a part of "any communication" made to such advocate by the victim of domestic violence. Accordingly, the defendant has the burden of demonstrating that the victim waived the privilege either expressly or by implication, which he failed to do. Lastly, we reject the defendant's contention that his right to compulsory process and his right to cross-examine witnesses are violated by our construction of the statute.

## I. BACKGROUND

On November 20, 2003, the Chaffee County District Attorney brought two domestic violence charges of assault and harassment against Robert Turner, Jr., stemming from

allegations that he battered his girlfriend, M.P.

During pretrial discovery, defense counsel discovered that M.P. had contacted the Alliance, a private, non-profit domestic violence victim advocacy center located in Salida, Colorado, in connection with the charges.

On April 14 and 16, 2004, defense counsel served the Alliance with two separate subpoenas *duces tecum* demanding production of records of M.P.'s contact with the Alliance. The first subpoena required the Alliance to produce "any and all records, notes and files regarding any and all assistance provided to [M.P.]." The second requested the same information "pursuant to [M.P.'s] reports of domestic violence/abuse on or about November 20, 2003 and thereafter."[1]

On April 20, relying on section 13–90–107, the Alliance noted its refusal to comply with the subpoena in a letter to defense counsel. In response, defense counsel filed a Motion to Compel with the county court, arguing that records of assistance provided by the Alliance to M.P. were properly discoverable because the victim-advocate privilege only applies to communications made by a victim of domestic abuse, and not to "assistance" provided by the organization. On April 29, 2004, contending that the plain language and underlying purpose of the statute attaches the privilege to records of assistance provided, the Alliance moved to quash the subpoena.

The county court conducted an evidentiary hearing on May 5, 2004, taking arguments from the defendant and the Alliance on the question of whether the defendant's request for records or reports of the kinds of assistance the Alliance provided M.P. fell within statutorily privileged "communications" made to victim advocates by a victim of domestic violence.

The court agreed with the defendant that the victim-advocate privilege was not intended to protect records of assistance provided by a domestic abuse agency. The court held that although evidence of housing assistance had "marginal relevance," it was nonetheless not protected by the privilege and was therefore discoverable. Although the court did deny the defendant full access to all records of M.P.'s contact with the agency, it nonetheless ordered the Alliance to "provide a broad outline as to the type of assistance," provided to M.P., including for example, "emergency financial assistance."

The Alliance petitioned from that decision and we accepted original jurisdiction.

## II. ORIGINAL JURISDICTION

■■■ We exercise our original jurisdiction with great care. Although we intercede in order to correct trial court abuse of discretion, we do so only when the rights implicated are important and there is a potential for irreparable harm. *See Hoffman v. Brookfield Republic, Inc.,* 87 P.3d 858 (Colo.2004); *Wesp v. Everson,* 33 P.3d 191, 194 (Colo. 2001). Moreover, although pretrial discovery orders are interlocutory and typically must await appeal, *see In re Attorney D.,* 57 P.3d 395, 398 (Colo.2002), we have upon occasion exercised our original jurisdiction to review such orders, particularly where the impact of the ruling on the parties would be substantial and incurable at a later time and where the ruling raises significant questions about the administration of pretrial discovery in general. *See Lazar v. Riggs,* 79 P.3d 105, 106 (Colo.2003).[2]

1. Because both subpoenas sought the same information, we treat them as one instrument throughout this opinion.

2. The defendant introduces two arguments that were not raised at the trial court level. First, he argues that the Alliance lacks standing because it failed to demonstrate that it qualifies as an "advocate;" and second, he argues that the Alliance may not assert the privilege on the victim's behalf. We need not address these issues simply because they were not raised below. If, however, we afford them further attention, we find no merit in them. As to the first issue, we note that the trial court clearly treated the Alliance as an advocate within the meaning of the statute; the record indicates the Alliance's contact with the alleged victim was in that capacity, and the defendant points to no contrary facts. As to the second argument, this court has, on several occasions, permitted the person issued a subpoena *duces tecum* to challenge an order compelling production of confidential information. *See, e.g., People v. Sisneros,* 55 P.3d 797 (Colo.2002); *People v. District Court,* 719 P.2d 722 (Colo.1986).

■ We choose to exercise our original jurisdiction in this case both because the outcome has a significant impact on these parties, and because the question of discoverability of a victim advocate records is an issue of public importance that this court has not previously addressed. *See Sanchez v. District Court*, 624 P.2d 1314, 1317 (Colo. 1981).

## III. ANALYSIS

We are asked to interpret section 13–90–107(1)(k)(I), which reads as follows:

> A victim's advocate shall not be examined as to any communication made to such victim's advocate by a victim of domestic violence, as defined in section 18–6–800.3(1), C.R.S., or a victim of sexual assault, as described in sections 18–3–401 to 18–3–405.5, 18–6–301, and 18–6–302, C.R.S., in person or through the media of written records or reports without the consent of the victim.

The defendant argues that the privilege does not extend to a victim's identity or the nature of the services provided by a victim's advocate organization. In essence, he asserts that the victim-advocate privilege is a one way protection, governing communications, or more precisely, statements made by the victim to the victim's advocate, but not "advice, information, assistance and/or services provided to the victim by a victim's advocate organization."

The Alliance counters that the victim-advocate privilege must be construed to include all communications between the victim and the agency, including records of assistance provided. Any other construction, in the Alliance's view, would weaken the entire purpose and thrust of the statute—namely, the protection of victims of domestic violence from any further abuse.

We agree with the Alliance. We hold that the plain language of the statute must be construed in a manner designed to serve the underlying objective of the privilege. Accordingly, the defendant may not obtain rec-

ords of any assistance, advice or other communication provided by a victim's advocate unless he demonstrates that the victim[3] has waived the privilege—which burden he has not here met. We also reject the defendant's contention that his right to compulsory process and confrontational rights are violated by our construction of the statute.

### A. Nature of Domestic Violence and Need for Privilege

In order to analyze the statute, we must first put it in context. The General Assembly acted around a time when domestic violence had been recognized as a "disease of epidemic proportions eating at the fabric of our society." Dale R. Harris, *The CBA Addresses Family Violence Issues*, 26 Colo. Law. 27 (1997) (citing statistics from 1996, a year after the 1994 omnibus domestic violence bill became effective); *see also* U.S. Dep't of Justice, Office of Justice Programs *Crime Data Brief: Intimate Partner Violence, 1993–2001* (2003) (noting 1.1 million nonfatal violent crimes by an intimate in 1993); *Developments in the Law: Legal Response to Domestic Violence*, 106 Harv. L.Rev. 1498, 1501 (1993) (noting Surgeon General's report that "abuse inflicted by intimates constitutes one of the leading causes of emergency room visits"). Domestic violence is defined in Colorado as "an act or threatened act of violence upon a person with whom the actor is or has been involved in an intimate relationship;" *see* section 18–6–800.3(1), C.R.S. (2004), and includes harassment, injury, control, terrorism or damage to property, *see* Leslie A. Hagen & Kim M. Rattet, *Communications and Violence Against Women: Michigan Law on Privilege, Confidentiality, and Mandatory Reporting* 17 T.M. Cooley L.Rev. 183, 188 (2000). Moreover, domestic violence often does not consist of a single incident; it is recognized instead as a continual state of victimization that involves several crimes. *See* U.S. Dep't of Justice, Office of Justice Program, *National Institute of Justice Research Report, Domestic and Sexual Violence Data Collection: A Report to Congress*

---

**3.** By referring to M.P. as the victim here, we imply nothing with respect to the defendant's guilt concerning the charges at issue. M.P. is the victim to whom the privilege applies here, and we use the term for that purpose only.

*Under the Violence Against Women Act* (1996).

Significantly, for purpose of this case, and contrary to common understanding, most victims of domestic violence attempt to flee from their abusers but are hampered by enormous economic hurdles, particularly if they have minor children. Joan Zorza, *Recognizing and Protecting the Privacy and Confidentiality Needs of Battered Women,* 29 Fam. L.Q. 273, 276 (1995). In 1990, the United States Senate Judiciary Committee reported that 50 percent of all homeless women and children were fleeing abuse. *Id.* Thus, the availability of services provided by domestic violence organizations, including housing assistance and counseling, is essential to helping victims escape from abusers. Near the time the General Assembly promulgated and implemented the 1994 omnibus domestic violence bill, Colorado battered women shelters housed over 6,000 clients. *See* Harris, *supra,* at 28 (citing 1996 statistics); *see also* Colorado Dep't of Human Services, Domestic Abuse Assistance Program Statistics for Calendar Year 2004 (citing the figure at about 5,500). The same year, Colorado shelters turned away almost 8,000 persons escaping abuse. *See id.* Non-shelter housing assistance furnished by domestic abuse agencies fills the gap where temporary shelter housing might be unavailable.

Domestic violence organizations also help to reduce the economic gap between abuse victims who can and those who cannot afford to secure the services of paid therapists. *Concerning Methods to Facilitate the Prosecution of Sexual Offenders by Affecting Statutes in a Manner Designed to Assist Sexual Assault Victims: Hearing on Senate Bill 95–153,* (Colo. February 22, 1995) (hereinafter *"Hearing on SB 95–153"*) (statement of co-sponsor, Senator Wham); *see also Jaffee v. Redmond,* 518 U.S. 1, 15–18, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (holding that the rationale for recognizing privilege for treatment by psychiatrists and psychologists apply with equal force to clinical social workers because their clients are often the poor and those with modest means who cannot afford the assistance of psychologists and therapists).

Maintaining and handling client records and collecting information from and about victims of domestic violence are a critical function of any victim advocacy program. *See* Ronald B. Adrine & Alexdria M. Ruden, *Confidentiality and Liability Concerns,* Oh. Domestic Violence L. § 16:4 (2004). The disclosure of the victim's residence or location can make the victim accessible to an abuser from whom he or she is hiding. *Id.*

It is within this unique societal setting that the General Assembly acted to create the victim-advocate privilege. Much like the psychologist-patient privilege, the assumption of confidentiality is essential to fostering trust between the parties to the relationship. *Hearing on SB 95–153* (statements of Senator Wham); *see also* U.S. Dep't of Justice, Report to Congress, *The confidentiality of Communications Between Sexual Assault or Domestic Violence Victims and Their Counselors: Findings and Model Legislation* (1995) (hereinafter *"DOJ Model Legislation"*) (recognizing that without assurances that communications made by the victim of domestic violence or sexual assault will be kept confidential, victims will be even more reluctant to seek counseling or to explore legal and social remedies). Concerning the psychologist-patient privilege the United States Supreme Court observed:

> Effective psychotherapy ... [d]epends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.

*Jaffee,* 518 U.S. at 10, 116 S.Ct. 1923. Indeed, we have likewise validated Colorado's psychologist-patient privilege, concluding that the disclosure of confidential counseling communications can cause the victim embarrassment and shame. *People v. Sisneros,* 55 P.3d 797, 800 (Colo.2002); *People v. Dist.*

*Court,* 719 P.2d 722, 725 (Colo.1986). We have noted in addition, that, although similar, the privilege is even more critical in the counseling context than in the physician-patient arena because a doctor may sometimes treat a patient's physical symptoms without the need for "trust." *See Bond v. Dist. Court,* 682 P.2d 33, 38 (Colo.1984). If victims fear that their abuser may have access to victim impact statements, pre-sentence reports, and compensation files, they are less likely to seek assistance. *see* U.S. Dep't of Justice, Office of Justice Programs *Privacy of Victims' Counseling Communications: Legal Series # 8,* 1 (2002) (hereinafter *"Legal Series # 8 "*).

Accordingly, having considered the framework of domestic violence and the privilege, we now proceed to examine the parameters of Colorado's statutory victim-advocate privilege and its application to this case.

### B.   The Victim–Advocate Privilege

■ The trial court concluded that the privilege does not protect records of assistance offered by the Alliance. We review the trial court order interpreting the victim-advocate privilege *de novo.* Generally, privileges are creatures of statute and therefore must be strictly construed. *Dist. Court,* 719 P.2d at 725; *see also* 1 *McCormick on Evidence* § 72, at 298–301 (5th ed. 1999 & Supp. 2003) (noting that privileges are strictly construed because all privileges derogate the search for truth). Our task is to ascertain the legislative intent, giving effect to the statute's plain meaning.

The victim-advocate privilege was adopted in 1994, *see* Ch. 327, sec. 7, § 13–90–107, 1994 Colo. Sess. Law, 2031, in furtherance of "the policy of the law to encourage confidences and to preserve them inviolate," *see* section 13–90–107(1)(k)(I).   The privilege provides that the victim's advocate shall not be examined "as to any communication made to such victim's advocate by a victim of domestic violence . . . in person or through the media

of written records or reports." The statute provides no exceptions and requires no balancing of competing interests. *See DOJ Model Legislation, supra,* Appendix 2 (distinguishing among state victim-advocate privileges that are absolute, semi-absolute and qualified, and characterizing Colorado's as "absolute").[4]

Furthermore, the statute recognizes the "victim advocate" as a person "[w]hose primary function is to render advice, counsel, or assist victims of domestic violence," *see* section 13–90–107(1)(k)(II)(A). Hence, the language anticipates that any number of services rendered by the advocate may be the subject of the victim's communications. Secure housing, for instance, could become the subject of communications made by a victim seeking to hide from an abuser. Assistance provided by the counselor is necessarily intertwined with information transmitted by the victim to the advocate.

The legislative history supports a conclusion that the General Assembly intended a broad construction of "communications." Representative DeGette, one of the co-sponsors of the bill explained that the privilege was intended to protect treatment by victim-advocates in the same manner as protections offered treatment by psychologists and psychotherapists. *See Hearing on HB 94–1253.*

More importantly, the clear language of the statute extends the privilege so as to prohibit the disclosure of information contained in records or reports, such that "examined" is not a restrictive term making the privilege effective only at trial. *Cf. Sisneros,* 55 P.3d at 800 (holding that once the psychologist-patient privilege attaches, it protects testimonial disclosures as well as pretrial discovery of files or records derived or created in the course of treatment); § 14–12–105, C.R.S. (2004) (creating privilege for communications made, oral or written, from "the parties to a domestic relations counselor" and extending said privilege to "any papers or records" of the counselor).[5]

4. Examples of states with differently framed statutes include Alaska, Hawaii, New Jersey, Arizona, California, and New Hampshire. *See DOJ Model Legislation, supra,* Appendix 2; *Legal Series 8, supra,* at 3.

5.  We are aware that the legislature could have followed other states with similar victim-advocate privileges by specifically protecting the victim's identity and services provided by the advocate. Because the General Assembly could have

■ Accordingly, the plain language of the statute leads us to conclude that the privilege extends to services or assistance provided by the agency to the victim.

The defendant's emphasis on the fact that the subpoena was generic and that the trial court ordered the Alliance to provide a sanitized list of the services rendered to the victim does not negate our conclusion. The mere disclosure that the individual received any services violates confidentiality because it implicitly reveals statements made by the victim to the victim's advocate. Disclosing the victim's identity and the nature and extent of the services compounds the error. The statute's legislative history is consistent with this understanding. Senator Wham, a co-sponsor of the amendment expanding the privilege to include rape crisis organizations, expressed that "the assumption of privilege" is essential to encouraging victims to seek assistance. *Hearing on SB 95–153, supra.* Senator Wham explained that it was important for victims to know, even before contacting advocacy centers that their communications would be kept confidential. *Id.* In total, the victim-advocate privileges "reflect the role of [victim advocates] as the last resort from an abusive relationship and underscore the critical importance of anonymity and secrecy" in protecting the victim from further abuse. *See State ex rel. Hope House, Inc. v. Merrigan,* 133 S.W.3d 44, 48 (Mo.2004).

Of course, in the face of any privilege, the defendant may still discover records or reports of assistance by demonstrating waiver. At this point in the proceeding, the defendant has made no such showing.

■ At the hearing before the trial court, the defendant argued that the prosecution's endorsement of an expert who would testify about the cycle of domestic violence and about reasons why a victim might recant effectively waived the privilege. The defendant now renews that argument, which the trial court did not address because it held the privilege inapplicable. The party seeking to overcome the privilege bears the burden of demonstrating that the privilege has been waived. *Wesp,* 33 P.3d at 198; *Johnson v. Trujillo,* 977 P.2d 152 (Colo.1999); *Clark v. District Court,* 668 P.2d 3, 8 (Colo.1983). Waiver is a form of consent to disclosure which must be justified by an evidentiary showing of an expressed or implied waiver. *Clark,* 668 P.2d at 8. It is undisputed that M.P. did not expressly waive the privilege; thus, we must determine from the circumstances of the case whether she waived the victim-advocate privilege by implication.

■ The mere endorsement of a domestic violence expert—even if such expert is affiliated with the Alliance—cannot operate to waive the privilege. The defendant cites no law and makes no evidentiary showing to the contrary. We reject any suggestion that such an endorsement constitutes an implied waiver.[6]

## C. The Defendant's Due Process Argument

We now consider the defendant's argument that the confrontation clause entitles him to a broad cross-examination of witnesses against him, especially concerning their credibility. In support of that proposition, the defendant asserts that his Sixth Amendment right to examine witnesses is furthered by the exercise of his right of compulsory process, enti-

been clearer it does not follow that they were insufficiently clear. Our statute protects *"any communications"* made to the victim, and "communication" includes "service." For examples of other states' victim-advocate privilege statutes see Missouri's, V.A.M.S. § 455.220(1)(5)(2004) (prohibiting disclosure of victim's identity and any information directly related to advocacy services); Florida's, Fla. Stat. Ann. ch. 90.5036(1)(d) (West 2005) (protecting "confidential" communication relating to the incident of domestic violence for which the victim is seeking assistance and including "any record made in the course of advising, counseling, or assisting

the victim"); Pennsylvania's, 23 Pa. Cons.Stat. Ann. § 6116 (West 2005) (protecting confidential communications, which include "all information whether written or spoken, transmitted between the victim and advocate in the course of the relationship").

**6.** The defendant makes an additional argument that the victim waived the privilege by stating her desire that the case not be prosecuted in the presence of a third party. The defendant did not raise the argument in the trial court. We decline to review it here.

tling him to compel the Alliance to comply with the subpoena *duces tecum.*

■ The United States Supreme Court has identified two types of confrontation clause protections afforded the defendant: the right physically to face those who testify against him, and the right to conduct cross-examination. *Delaware v. Fensterer,* 474 U.S. 15, 18–19, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). Here, the defendant argues in essence that the Alliance's argument that the privilege protects records of assistance provided the victim interferes with his ability to prepare his defense adequately because he would be hampered in cross-examining the alleged victim by probing her motive and credibility.

In *Clark,* 668 P.2d at 8, we rejected the argument that the physician-patient and psychologist-client privileges should be qualified and therefore subject only to a balancing test weighing the holding party's interest in the privilege against the challenging party's need for the information. Instead, since we found no such limiting language in the statute governing the privileges at issue, we held that "the only basis for authorizing a disclosure of the confidential information is an express or implied waiver." *Id.* In *District Court,* 719 P.2d at 726, we addressed the issue of whether defining the victim's rights under the psychotherapist-patient privilege as absolute interfered with the defendant's right to confront adverse witnesses. We acknowledged that the purpose of the right to confrontation and cross-examination, among other things, is to "sift the conscience of the witness, and to test the recollection of the witness to determine if his or her story is worthy of belief." *Id.* We made clear, however, that the defendant's right to cross-examination is not absolute, explaining that under appropriate circumstances, the trial court may limit the defendant's right of confrontation. *Id.* As we saw it, the defendant's

right to cross-examine adverse witnesses must bow to the strong public policy interest in encouraging victims of sexual assaults to obtain meaningful psychotherapy. *Id.* We reasoned, "The defendant's constitutional right to confrontation is not so pervasive as to place sexual assault victims in the untenable position of requiring them to choose whether to testify against an assailant or retain the statutory right of confidentiality in post-assault psychotherapy records." *Id.* at 727. We implied, however, that had the defendant made a "particularized factual showing in support of his assertion that access to privileged communications of the victim" was necessary for the effective exercise of his right of confrontation, the result would have been different. *Id.*[7]

A year after our decision in *District Court,* the Supreme Court decided *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). The Court dealt with the question of whether and to what extent the State's interest in the confidentiality of its investigative files concerning child abuse must yield to the defendant's confrontational rights. *Id.* at 43, 107 S.Ct. 989. There, the defendant was charged with sexually assaulting his 13–year–old daughter who had been placed in a state-created protective service agency. *Id.* The agency was charged with investigating the abuse of children in its custody. *Id.* The statute made investigative reports by the agency confidential, subject to eleven exceptions. *Id.* The defendant issued a subpoena to the agency to produce its files. *Id.* The Agency refused to comply. *Id.* at 44, 107 S.Ct. 989. The state supreme court reversed the trial court decision denying the defendant access to the files, on grounds that the decision violated the defendant's right to cross-examine witnesses and his right to compulsory process. *Id.* at 46, 107 S.Ct. 989. The Supreme Court ultimately rejected the former position and held that the right to

7. Our statement in *District Court* that the defendant failed to make a more particularized showing does not change the result we reach here. First, we were not presented in that case with the question of the defendant's right to compulsory process. In addition, even if balancing were warranted here, we are not persuaded that the evidence sought by the defendant is of sufficient relevance to trump the strong policy favoring the victim-advocate privilege. Even the trial court acknowledged that the relevance of evidence of assistance provided the victim by the Alliance is "marginal" at best. The defendant concedes that he has access to other evidence that will allow him to question M.P.'s credibility and motive.

question adverse witnesses does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Rather, the Court concluded that "the right is satisfied if defense counsel receives wide latitude at trial to question witnesses." *Id.* at 53, 107 S.Ct. 989.

Addressing the state supreme court's holding that the Sixth Amendment guarantee of compulsory process required full access to the files, the court noted that it had traditionally evaluated such claims under the broader protections of the Fourteenth Amendment Due process clause. *Id.* at 56, 107 S.Ct. 989. As such, the Court held that compulsory process obligates the government (which necessarily includes a state-created protective services agency) to turn over exculpatory evidence to the accused. *Id.* at 57, 107 S.Ct. 989. The Court especially noted that the state confidentiality statute at issue unequivocally qualified the privilege, by contemplating "*some* use of [the agency's] records in judicial proceedings." *Id.* at 58, 107 S.Ct. 989.

Here, the victim-advocate privilege excludes from the definition of "victim advocate" "an advocate employed by any law enforcement agency." § 13–90–107(1)(k)(II). Unlike the state statute in *Ritchie,* moreover, our statute defines the privilege without exceptions. As noted in *Clark,* we reject the application of an *ad hoc* regime to determine the scope of the victim's rights under a statute that creates such a privilege. Accordingly, the defendant's compulsory process claim fails.

[9] We hold that neither the defendant's right to cross-examine witnesses, nor his right to compulsory process is violated by withholding records of any assistance the Alliance may have provided M.P.

## III. CONCLUSION

We conclude that the underlying purpose of the victim-advocate privilege and the plain language of the statute forbid the disclosure of records or reports of assistance provided the victim by the Alliance in this case. We recognize that the strong public policy under-

lying the statute requires that records of assistance or services offered to victims be kept confidential. To interpret the statute otherwise would betray that clear intent. Further, we find nothing in the record to support the defendant's contention that M.P. has at present waived the privilege either expressly or by implication. Lastly, we reject the defendant's contention that his Sixth Amendment right to confrontation and his right to compulsory process entitle him to the Alliance's records. We therefore conclude that the trial court abused its discretion by compelling the Alliance to produce records pursuant to the subpoena in this case. We make our Rule absolute, reverse the decision of the trial court and remand for further proceedings consistent with this opinion.