**In re Subpoena to CRISIS CONNECTION, INC.**

**State of Indiana, Appellee–Plaintiff,**

v.

**Ronald Keith Fromme, Appellee–Defendant.**

No. 19A05–0910–CR–602.

Court of Appeals of Indiana.

July 15, 2010.

Jon B. Laramore, Matthew T. Albaugh, Trina K. Taylor, Baker & Daniels LLP, Indianapolis, IN, Attorneys for Appellant Crisis Connection, Inc.

S. Anthony Long, Long & Mathies Law Firm, Boonville, IN, Attorney for Appellee Ronald Keith Fromme.

## OPINION

CRONE, Judge.

### Case Summary

Crisis Connection, Inc., is a nonprofit organization that provides services, including counseling, to victims of domestic violence and sexual assault. In connection with a criminal case in which Ronald Keith Fromme is the defendant, Crisis Connection was ordered to produce records to the court for an *in camera* review. Crisis Connection appeals, requiring us, as a matter of first impression, to interpret Indiana's victim-advocate privilege and to

---

1. We heard oral argument on June 3, 2010 in Indianapolis. We thank counsel for their able presentations.

2. Crisis Connection does not confirm or deny that it provided services to M.Y., D.Y., or their

determine whether it must be limited by a criminal defendant's constitutional rights. Concluding that an *in camera* review properly balances Fromme's constitutional rights and the victims' interest in privacy, we affirm.

### Issues

I Are the records sought by Fromme subject to the victim-advocate privilege?

II. If so, is Fromme constitutionally entitled to have the trial court review the records in camera, notwithstanding the victim-advocate privilege?

### Facts and Procedural History[1]

Fromme has been charged with two counts of class A felony child molesting. Fromme served a subpoena *duces tecum* on Crisis Connection, seeking all records relating to the alleged victims, M.Y. and D.Y., and their mother. On February 28, 2008, Crisis Connection moved to quash the subpoena, arguing that the records sought are privileged. *See* Ind.Code § 35–37–6–9 (victim-advocate privilege).[2]

On August 4, 2008, Fromme filed a motion to compel Crisis Connection to produce the records. On August 14, 2008, the trial court held a hearing on the motion and ordered the parties to file responses. On December 22, 2008, Fromme filed a renewed motion to compel, and thereafter, both parties filed their responses. Another hearing was held, and on May 27, 2009, the trial court granted Fromme's motions in part:

mother; however, for sake of appeal, Crisis Connection "operates under the assumption that it possesses records responsive to the court's order." Appellant's Br. at 2.

1. Defendant's above motions shall be granted as to information requested regarding any reports made to Crisis Connection by or on behalf of [redacted], subject to the restrictions below, and shall be denied as to Defendant's request regarding similar information regarding [redacted].

2. The response of Crisis Connection shall be delivered to the Court, and the Court shall review said records to determine the relevance of any such records. The Court will then inform the parties of its decision.

3. In finding as above, the Court has determined that the items being sought are sufficiently identified, may be essential for the Defendant in determining the credibility of the complaining witnesses, and may be material to the Defendant's defense.

Appellant's App. at 17.

On June 9, 2009, Crisis Connection filed a motion to reconsider, or in the alternative, to certify the May 27 order for interlocutory appeal. A hearing on that motion was held on June 16, 2009, and Fromme filed a response on June 23, 2009. On October 5, 2009, the trial court denied the motion to reconsider and certified the May 27 order for interlocutory appeal. On November 18, 2009, we accepted jurisdiction.

## Discussion and Decision

### I. *Structure and Scope of the Victim–Advocate Privilege*

"Our standard of review in discovery matters is abuse of discretion." *Williams v. State,* 819 N.E.2d 381, 384 (Ind.Ct.App.2004), *trans. denied.* This standard of review also applies to requests for *in camera* review to determine whether the evidence sought is discoverable. *In re WTHR–TV,* 693 N.E.2d 1, 6 (Ind.1998). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts of the case. *Williams,* 819 N.E.2d at 384. When a criminal defendant seeks access to confidential information, appellate courts " 'rely particularly heavily on the sound discretion of the trial judge to protect the rights of the accused' " as well as the party seeking to keep the information confidential. *Rubalcada v. State,* 731 N.E.2d 1015, 1018 (Ind.2000) (quoting *United States v. Plescia,* 48 F.3d 1452, 1457 (7th Cir.1995), *cert. denied* ). "We may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though this was not the reason enunciated by the trial court." *Williams,* 819 at 384–85.

However, to the extent the court's order is based on interpretation of a statute, our review is *de novo.* *See Jacks v. State,* 853 N.E.2d 520, 522 (Ind. Ct.App.2006) (holding admissibility of evidence is normally within the trial court's discretion, but ruling would be reviewed *de novo* when it turned on the interpretation of a statute). Indiana Code § 35–37–6–9, which establishes the victim-advocate privilege, has never been interpreted. "When a statute has not previously been interpreted, the express language of the statute and the rules of statutory construction control the statute's interpretation. Pursuant to these rules, an unambiguous statute must be construed to mean what it plainly expresses." *Orban v. Krull,* 805 N.E.2d 450, 453 (Ind.Ct.App.2004) (citations omitted). Every word should be given effect, and "no part of the statute is to be construed so as to be meaningless, if it can be reconciled with the rest of the statute." *State v. Rumple,* 723 N.E.2d 941, 944 (Ind.Ct.App.2000). "Our goal in statutory construction is to determine, give effect to, and implement the intent of the legislature." *State v. Prater,* 922 N.E.2d 746, 748 (Ind.Ct.App.2010). Even when supported by sound public policy, eviden-

tiary privileges "'are not lightly created nor expansively construed, for they are in derogation of the search for truth.'" *Hulett v. State,* 552 N.E.2d 47, 49 (Ind.Ct. App.1990) (quoting *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)), *trans. denied.*

Indiana Code § 35–37–6–9 provides, in relevant part:

> (a) The following persons or entities may not be compelled to give testimony, to produce records, or to disclose any information concerning confidential communications and confidential information to anyone or in any judicial, legislative, or administrative proceeding:
>
> > (1) A victim.
> >
> > (2) A victim advocate or victim service provider unless the victim specifically consents to the disclosure in a written authorization that contains the date the consent expires.
>
> (b) A victim advocate, victim service provider, or victim may not be compelled to provide testimony in any judicial, legislative, or administrative proceeding that would identify the name, address, location, or telephone number of any facility that provided temporary emergency shelter to the victim of the offense or transaction that is the subject of the proceeding unless the facility is a party to the proceeding.

The statute does not contain a statement of purpose, but other jurisdictions have compared their victim-advocate privilege to the psychotherapist-patient privilege. *See, e.g., People v. Turner,* 109 P.3d 639, 643 (Colo.2005). Other courts have noted that the victim-advocate privilege is meant to provide victims of lesser economic means with the same confidentiality that would exist if the victim were able to afford private psychotherapeutic treatment. *See, e.g., Commonwealth v. Wilson,* 529 Pa. 268, 602 A.2d 1290, 1294 (1992), *cert. denied.* The United States Supreme Court has recognized the importance of confidentiality to the psychologist-patient relationship:

> Effective psychotherapy ... depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace.

*Jaffee v. Redmond,* 518 U.S. 1, 10, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996).

Crisis Connection argues that its records clearly fall within the victim-advocate privilege, which it characterizes as "absolute." *See, e.g.,* Appellant's Br. at 4. Fromme does not dispute that Crisis Connection is a victim service provider.[3] Pur-

---

**3.** Ind.Code § 35–37–6–5 defines "victim service provider" as follows:

> As used in this chapter, "victim service provider" means a person:
> > (1) that is
> > (A) a public agency;
> > (B) a unit of a public agency; or
> > (C) an organization that is exempt from federal income taxation under Section 501 of the Internal Revenue Code;
> > (2) that is not affiliated with a law enforcement agency;

> > (3) that has, as one (1) of its primary purposes, to provide services for emotional and psychological conditions that occur to an individual:
> > (A) against whom an act of:
> > (i) domestic or family violence;
> > (ii) dating violence;
> > (iii) sexual assault (as defined in IC 5–26.5–1–8);
> > (iv) human and sexual trafficking (IC 35–42–3.5); or
> > (v) stalking (IC 35–45–10–5);
> > is committed; or

suant to Indiana Code § 35–37–6–3.5, any employee or volunteer of a victim service provider is a "victim advocate." Indiana Code § 35–37–6–1 defines "confidential communication" as follows:

(a) As used in this chapter, "confidential communication" means any information:

(1) exchanged between a victim and a victim advocate in the course of the relationship between the victim and the victim advocate;

(2) exchanged or disclosed in a support group in which a victim is or was a participant; or

(3) exchanged in the presence of a third person who facilitates or facilitated communication between a victim and a victim advocate.

(b) The term includes communication that is verbal or written and includes:

(1) advice;

(2) notes;

(3) reports;

(4) statistical data;

(5) memoranda;

(6) working papers;

(7) records; and

(8) personally identifying information;

produced in the course of advocating for a victim.

Indiana Code § 35–37–6–1.5 defines "confidential information" as follows:

(a) As used in this chapter, "confidential information" includes:

(1) personally identifying information;

(2) descriptions of physical appearance;

(B) who:
(i) is not accused of committing [one of the offenses listed in clause (A)]; and

(3) the case file; and

(4) the case history;

of a person who seeks, receives, or has received services from a victim advocate.

(b) The term does not include:

(1) information disclosed to a victim service provider or a victim advocate if the victim:

(A) files criminal charges;

(B) institutes a civil lawsuit; or

(C) reports allegations of criminal conduct to a law enforcement agency;

against the victim service provider or victim advocate; and

(2) alleged child abuse or neglect that is required to be reported under IC 31–33.

The statute appears to provide extensive protection not only of communications made to counselors, but also to communications and information exchanged with any employee or volunteer providing any type of service to a victim, as well as participants in support groups. On the other hand, the statute excludes from the definition of "confidential information" information regarding alleged child abuse or neglect that is required to be reported under Indiana Code Article 31–33. Ind. Code § 35–37–6–1.5(b)(2). The meaning of Indiana Code § 35–37–6–1.5(b)(2) is unclear. Article 31–33 does not delineate what information must be included in a report to law enforcement or the Department of Child Services ("DCS"). Indiana Code § 31–33–7–4 requires DCS to make a written report within forty-eight hours of receiving a report of abuse or neglect. DCS's written report is to include:

(1) The names and addresses of the following:

(ii) is a member of the family of an individual described in clause (A). . . .

(A) The child.

(B) The child's parents, guardian, custodian, or other person responsible for the child's care.

(2) The child's age and sex.

(3) The nature and apparent extent of the child's injuries, abuse, or neglect, including evidence of prior:

(A) injuries of the child; or

(B) abuse or neglect of the child or the child's siblings.

(4) The name of the person allegedly responsible for causing the injury, abuse, or neglect.

(5) The source of the report.

(6) The person making the report and where the person can be reached.

(7) The actions taken by the reporting source, including the following:

(A) Taking of photographs and x-rays.

(B) Removal or keeping of the child.

(C) Notifying the coroner.

(8) The written documentation required by IC 31–34–2–3 if a child was taken into custody without a court order.

(9) Any other information that:

(A) the director [of DCS] requires by rule; or

(B) the person making the report believes might be helpful.

Ind.Code § 31–33–7–4(b). Thus, Article 31–33 appears to contemplate that a person required to make a report will give any information that might help the authorities investigating the case. Pursuant to Indiana Code § 31–33–18–1, reports received or written by DCS are confidential and may only be disclosed under circumstances identified in Indiana Code Chapter 31–33–18.

▋ Although clumsily drafted, we believe that the purpose of Indiana Code § 35–37–6–1.5(b)(2) is to clarify that victim service providers and advocates are still required to make reports in accordance with Article 31–33, rather than to make information concerning child abuse non-confidential. To hold otherwise would undermine Indiana Code § 31–33–18–1, which makes reports to DCS confidential. Furthermore, as the report could include almost anything a child abuse victim communicates to a victim service provider or advocate, making such information non-confidential would leave a gaping hole in an otherwise broadly-written privilege. Thus, we conclude that the privilege applies to Crisis Connection's records.

Fromme's only argument concerning the interpretation of Chapter 35–37–6 is that its provisions cannot be harmonized. Fromme notes that Indiana Code § 35–37–6–11 allows a victim advocate to "testify or produce records regarding confidential communications with the victim" if the victim sues the victim advocate for malpractice. Fromme argues:

It is difficult to reconcile a statute that absolutely prohibits release of documents to a criminal defendant that are essential to his defense and the safeguard of his liberty, but would allow those same documents to be released when a counseling service is faced with an action for monetary damages.

Appellee's Br. at 6. In the context of the attorney-client and accountant-client privileges, we have held that the privilege is waived when the client files a malpractice suit. *First Cmty. Bank & Trust v. Kelley, Hardesty, Smith & Co.*, 663 N.E.2d 218, 222 (Ind.Ct.App.1996). Presumably, when the victim files a malpractice action against the victim advocate, there has already been a breakdown of the relationship that the privilege seeks to protect. Therefore, we conclude that the provisions of Chapter 35–37–6 are not irreconcilable.

## II. Constitutional Issues

 Fromme argues that application of the privilege violates his constitutional rights. Both parties agree that issues of constitutional law are reviewed *de novo*. *See King v. State*, 877 N.E.2d 518, 521 (Ind.Ct.App.2007) (constitutional challenges are reviewed *de novo* ). Fromme's constitutional arguments are not clearly delineated in the record before us, but it appears that he invokes the confrontation and compulsory process clauses of the Sixth Amendment and the due process clause of the Fourteenth Amendment.[4] This is an issue of first impression of Indiana. To reach our conclusion, we will examine Supreme Court precedent, decisions from other states that have addressed this issue, and Indiana decisions addressing other privileges.

### A. Supreme Court Precedent

The leading case on the intersection of these rights with statutory privileges is *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). Pennsylvania created an agency called Children and Youth Services ("CYS"), which was charged with investigating cases of suspected mistreatment and neglect. George Ritchie was charged with several sex offenses committed against his daughter, and he sought to compel CYS to disclose its records relating to him. The trial court refused to order CYS to disclose its records, but the Pennsylvania Supreme Court held that denial of access to the records violated Ritchie's rights to confrontation and compulsory process and concluded that Ritchie's lawyer should be allowed to review the entire CYS file. The State of Pennsylvania appealed to the Supreme Court.

Section III–A of the opinion, which addressed the confrontation clause issue, was a plurality opinion. "The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Id.* at 51, 107 S.Ct. 989. Ritchie claimed that by denying him access to the CYS records, the trial court interfered with his right of cross-examination. The plurality disagreed, holding that such an interpretation would "transform the Confrontation Clause into a constitutionally compelled rule of pretrial discovery." *Id.* at 52, 107 S.Ct. 989. The plurality stated that the right to confrontation "is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination." *Id.* (emphasis in original).

The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testi-

---

**4.** Crisis Connection argues that Fromme waived any argument based on the Sixth Amendment because he did not raise it in the trial court. *See In re L.B.*, 889 N.E.2d 326, 334 (Ind.Ct.App.2008) ("It is well established that we may deem a party's constitutional claim waived when it is raised for the first time on appeal."). The appellant's appendix does not contain all of Fromme's filings with the trial court. In addition, the court held several hearings concerning access to Crisis Connection's records, and Crisis Connection has not submitted a transcript of any of those hearings. Therefore, we cannot confirm Crisis Connection's argument. On discovery issues, we may affirm the trial court on any basis supported by the record. *Williams*, 819 at 384–85. Therefore, we will address Fromme's arguments under the Sixth Amendment.

Fromme also mentions Article 1, Section 13 of the Indiana Constitution in his brief. However, he does not provide any analysis of that provision. A state constitutional issue is waived when a party does not provide a separate analysis of that issue. *Davis v. State*, 907 N.E.2d 1043, 1048 n. 10 (Ind.Ct.App.2009).

mony. Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses.

*Id.* at 53, 107 S.Ct. 989 (footnote and citation omitted). Thus, the plurality concluded that Ritchie's right to confrontation had not been violated. *Id.* at 54, 107 S.Ct. 989.

In Section III–B of the opinion, a majority of the Court addressed whether disclosure was required pursuant to the compulsory process clause. The Court began by noting it "has had little occasion to discuss the contours of the Compulsory Process Clause." *Id.* at 55, 107 S.Ct. 989. At a minimum, this clause guarantees defendants "the right to the government's assistance in compelling the attendance of favorable witnesses at the trial and the right to put before a jury evidence that might influence the determination of guilt." *Id.* at 56, 107 S.Ct. 989. The Court noted it had "never squarely held that the Compulsory Process Clause guarantees the right to discover the *identity* of witnesses, or to require the government to produce exculpatory evidence." *Id.* (emphasis in original). The Court stated that it had traditionally evaluated claims like Ritchie's under the due process clause of the Fourteenth Amendment. Concluding that the compulsory process clause "provides no *greater* protections in this area than those afforded by due process," the Court declined to determine whether and how the two clauses differ and proceeded to decide the issue under the due process clause. *Id.* (emphasis in original).

The Court held there was not an absolute ban on disclosure under the circumstances:

Although we recognize that the public interest in protecting this type of sensitive information is strong, we do not agree that this interest necessarily prevents disclosure in all circumstances. This is not a case where a state statute grants CYS the absolute authority to shield its files from all eyes. Rather the Pennsylvania law provides that the information shall be disclosed in certain circumstances, including when CYS is directed to do so by court order. Given that the Pennsylvania Legislature contemplated *some* use of CYS records in judicial proceedings, we cannot conclude that the statute prevents all disclosure in criminal prosecutions. In the absence of any apparent state policy to the contrary, we therefore have no reason to believe that relevant information would not be disclosed when a court of competent jurisdiction determines that the information is "material" to the defense of the accused.

*Id.* at 57–58, 107 S.Ct. 989 (citations and footnote omitted, emphasis in original). The Court expressly stated that it gave "no opinion on whether the result in this case would have been different if the statute had protected the CYS files from disclosure to *anyone,* including law-enforcement and judicial personnel." *Id.* at 57 n.14, 107 S.Ct. 989 (emphasis in original). The Court concluded that due process would be satisfied if the trial court conducted an *in camera* review of the CYS file. *Id.* at 60, 107 S.Ct. 989.

The plurality in *Ritchie* consisted of Justices Powell, Rehnquist, White, and O'Connor. Justice Blackmun wrote that a state cannot "avoid Confrontation Clause problems simply by deciding to hinder the defendant's right to effective cross-examination, on the basis of a desire to protect the confidentiality interests of a particular class of individuals, at the pretrial, rather than at the trial, stage." *Id.* at 65, 107 S.Ct. 989 (Blackmun, J., concurring in part and concurring in the judgment). He believed that the case was controlled by *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct.

1105, 39 L.Ed.2d 347 (1974), in which the Court held that Davis's right to confrontation was violated when the trial judge prohibited defense counsel from questioning a witness about the latter's juvenile record, which was confidential pursuant to statute. Justice Blackmun's opinion states:

> The similarities between *Davis* and this case are much greater than are any differences that may exist. In cross-examining a key prosecution witness, counsel for Davis and counsel for respondent were both limited to simple questioning. They could not refer to specific facts that might have established the critical bias of the witness: Davis' counsel could not do so because, while he had the juvenile record in hand, he could not refer to it in light of the Alaska rule; respondent's attorney had a similar problem because he had no access at all to the CYS file of the child-abuse victim. Moreover, it is likely that the reaction of each jury to the actual cross-examination was the same—a sense that defense counsel was doing nothing more than harassing a blameless witness.

*Ritchie*, 480 U.S. at 64, 107 S.Ct. 989 (Blackmun, J., concurring in the judgment). However, Justice Blackmun concurred in the judgment, as he felt that the *in camera* review would remedy any confrontation clause violation. *Id.* at 65, 107 S.Ct. 989.

Justices Stevens, Brennan, Marshall, and Scalia dissented on jurisdictional grounds; however, Justices Brennan and Marshall wrote separately to indicate that they also disagreed with the plurality's interpretation of the confrontation clause.[5] Justice Brennan's opinion states:

A crucial avenue of cross-examination also may be foreclosed by the denial of access to material that would serve as the basis for this examination. Where denial of access is complete, counsel is in no position to formulate a line of inquiry potentially grounded on the material sought. Thus, he or she cannot point to a specific subject of inquiry that has been foreclosed, as can a counsel whose interrogation at trial has been limited by the trial judge. Nonetheless, there occurs as effective a preclusion of a topic of cross-examination as if the judge at trial had ruled an entire area of questioning off limits.

*Id.* at 67, 107 S.Ct. 989 (Brennan, J., dissenting).

■■■ Crisis Connection characterizes Indiana's victim-advocate privilege as "absolute." *See, e.g.,* Appellant's Br. at 4. As we will discuss below, several states have distinguished *Ritchie* by finding that their privileges are absolute. We decline to hold that Indiana's victim-advocate privilege is absolute. As we have discussed, otherwise confidential information may be disclosed if the victim files a malpractice suit and must be disclosed to comply with abuse-reporting laws. Thus, contrary to Crisis Connection's argument, victim service providers cannot give their clients "upfront assurance" that "anything they discuss will be kept confidential." *Id.* at 10. Nevertheless, there is no applicable statutory exception that would allow Fromme to discover Crisis Connection's records for use in his criminal case. Therefore, although Indiana's victim-advocate privilege is not absolute, this case still is not on all fours with *Ritchie.*

---

**5.** Justice Scalia, the only member of the *Ritchie* court still sitting on the Supreme Court, displaying an uncharacteristic reticence, expressed no opinion on the confrontation clause issue.

## B. Other Jurisdictions' Approaches

Since there is no Supreme Court precedent directly on point, we will consider how other jurisdictions have approached the issue. Crisis Connection urges us to follow the approach of *Wilson*, 602 A.2d 1290; *Turner*, 109 P.3d 639; *State v. J.G.*, 261 N.J.Super. 409, 619 A.2d 232 (1993); *People v. Foggy*, 121 Ill.2d 337, 118 Ill.Dec. 18, 521 N.E.2d 86, 92 (1988), *cert. denied*; *State v. Pinder*, 678 So.2d 410 (Fla. 4th Dist.Ct.App.1996); and *State v. Gomez*, 63 P.3d 72 (Utah 2002). Crisis Connection characterizes these cases as holding "that disclosure, even *in camera*, is not necessary to protect a defendant's constitutional rights and would have a deleterious effect on the privacy rights of victims." Appellant's Reply Br. at 16.

In 1981, the Pennsylvania Supreme Court held that counseling records should be reviewed *in camera*. *In the Matter of Pittsburgh Action Against Rape*, 494 Pa. 15, 428 A.2d 126 (1981). About a year later, the legislature responded by enacting a statute establishing a victim-sexual assault counselor privilege. In *Wilson*, the Supreme Court of Pennsylvania later upheld the statutory privilege against a Sixth Amendment challenge.

 Regarding the confrontation clause argument, the court followed *Ritchie*, but failed to recognize that that portion of *Ritchie* was a plurality opinion. 602 A.2d at 1296. When a plurality opinion is issued, "its precedent is the narrowest holding that garnered five votes." *United States v. Spencer*, 592 F.3d 866, 879 n. 4 (8th Cir.2010). *See also Altria Group, Inc. v. Good*, — U.S. —, 129 S.Ct. 538, 554, 172 L.Ed.2d 398 (2008) ("At most, [a plurality opinion] is a 'point of reference for further discussion.' ") (Thomas, J., dissenting). *Ritchie's* discussion of the confrontation clause is not part of the narrowest holding.

Regarding the due process claim, the *Wilson* court described *Ritchie* as follows:

The [*Ritchie*] Court reasoned that the Commonwealth's interest in protecting the files could not be compelling, as suggested, because the statute itself provided for disclosure of the files in certain circumstances. The recognition by the legislature of those instances of disclosure, the Court found, certainly raised an inference that the defendant could be permitted access to information "material" to his case.

*Id.* at 1297 (citations omitted). The *Wilson* court therefore found *Ritchie* distinguishable because the privilege at issue in *Wilson* was absolute. *Id.* While *Ritchie* holds open the possibility that the due process clause might apply differently to an absolute privilege, *Ritchie* itself does not provide support for that proposition, as the Court expressly refused to consider it. 480 U.S. at 57 n. 14, 107 S.Ct. 989.

Justice Zappala dissented in *Wilson*, stating:

The hallowed principle that one remains innocent until proven guilty is hollow indeed if one's constitutional rights must always bend to a statutory privilege. When a defendant has shown a legitimate need for access to communications, the testimonial privilege ... must yield to the constitutional rights of a criminal defendant to due process and to confront his accuser. . . .

The majority's sanctification of the statutory privilege is at great cost to our constitutional rights. I am sympathetic to the physical and emotional trauma suffered by a rape victim, but I am not willing to sacrifice the guarantees of our Constitution to assuage the harm.

*Wilson*, 602 A.2d at 1299 (Zappala, J., dissenting). Justice Zappala suggested that the competing interests should be

weighed and felt that the *in camera* review procedure established in earlier Pennsylvania case law provided the appropriate balance between the rights of the accuser and the accused. *Id.* at 1300.

In *Commonwealth v. Kennedy*, the Pennsylvania Superior Court addressed whether the defendant, who was charged with sexually assaulting his stepdaughter, was entitled to disclosure of the victim's psychotherapy records pursuant to the state constitution. 413 Pa.Super. 95, 604 A.2d 1036 (1992), *appeal denied.* The court concluded that an absolute privilege should not be "subject to balancing against a defendant's right of confrontation," because "such a balancing would, in effect, destroy the right which the privilege sought to protect." *Id.* at 1045.

Judge Cirillo concurred in the majority's decision to reverse on other grounds and wrote separately to express his view that due process requires that a defendant have access to counseling records:

> It is precisely because crimes of this nature are particularly heinous and violent, and because we mete out such severe punishment to those convicted of these crimes, that we must be even more vigilant in preserving the rights of the accused. Passion too easily allows us pause in our observance of the rights of the accused. "The requirement of 'due process' is not a fair weather or timid assurance. It must be respected in periods of calm and in times of trouble[.]" *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). The concept of procedural due process, though enduring and adaptable to changes in jurisprudential values, cannot be altered to accommodate the crime victim or to prevent the disintegration of the counseling relationship. The ease of

accusation and the difficulty of defense in sexual abuse cases heightens our responsibility to abide by this concept and afford the accused fundamental fairness in the context of his defense against criminal charges.

*Id.* at 1048 (Cirillo, J., concurring). Judge Cirillo criticized *Wilson*, stating, "The effectiveness of confrontation and cross-examination is undermined if pretrial access to relevant information is limited. Defendants gain nothing from receiving 'wide latitude' in questioning witnesses if they know nothing of that witness." *Id.*

The Colorado Supreme Court and the New Jersey Superior Court have employed reasoning similar to *Wilson*. In *Turner*, the Colorado Supreme held that Colorado's victim-advocate privilege was absolute unless waived by the victim. 109 P.3d at 644–45. In rejecting Turner's confrontation clause argument, the court referred to its previous cases regarding the psychotherapist-patient privilege and also relied on *Ritchie*, but did not acknowledge that the portion of *Ritchie* dealing with the confrontation clause was a plurality opinion. *Id.* at 646–47. As to the due process argument, *Turner* also distinguished *Ritchie* on the ground that Colorado's victim-advocate privilege is absolute. *Id.* at 647.

In *J.G.*, the New Jersey Superior Court also applied this reasoning in rejecting a due process challenge to New Jersey's victim-counselor privilege. 619 A.2d at 237. Like *Wilson* and *Turner*, *J.G.* distinguished *Ritchie* without engaging in any analysis of why a state's decision to make information completely confidential avoids the due process issue. *See id.* However, *J.G.* held open the possibility that the records might be accessed in "compelling circumstances." *See id.*

In *Foggy*, the Illinois Supreme Court addressed Illinois's victim-rape crisis counselor privilege. 118 Ill.Dec. 18, 521 N.E.2d

86. The Court held that the privilege was unqualified and acknowledged that *Ritchie* had left unresolved the issue of "whether an absolute privilege must yield to a criminal defendant's pretrial discovery request for otherwise privileged information that may provide material for use in cross-examining witnesses." *Id.*, 118 Ill.Dec. 18, 521 N.E.2d at 91. As *Ritchie* did not control, the court engaged in a fact-sensitive inquiry:

> It is important to note that in this case the defendant's request for an *in camera* inspection of the counseling records was merely general; he did not allege that information may exist in the counseling files that would be subject to disclosure. Moreover, the defendant had access to the array of unprivileged statements made by the complaining witness to other persons following the commission of the offenses....

*Id.* Under the circumstances of the case, the court concluded that the defendant's vague assertions that the counseling records may contain useful material did not justify ignoring the statutory privilege. *Id.*, 118 Ill.Dec. 18, 521 N.E.2d at 92.[6]

Justice Simon dissented, stating, "Allowing, at a minimum, *in camera* inspection by the trial court of the communications between the rape crisis counselor and the victim would achieve the balance necessary to protect the interests of both parties." *Id.*, 118 Ill.Dec. 18, 521 N.E.2d at 93 (Simon, J., dissenting).

> In determining which interests and relationships should be protected by privilege, and to what extent they should be protected, courts and legislatures must balance the State's interest in the privilege against the constraints the privilege places on the fair and effective adminis-

tration of justice.... Although the State's interest in this case is a strong one and undoubtedly justifies a statute conferring some privilege protection on counseling records ... it is not strong enough to sustain an absolute privilege which renders meaningless the defendant's constitutional rights.

*Id.* at 352, 118 Ill.Dec. 18, 521 N.E.2d 86. He contended that the interest advanced in this case was no more compelling than the interest advanced in *Ritchie*. *Id.* at 355, 118 Ill.Dec. 18, 521 N.E.2d 86.

Judge Simon claimed that privileges must yield to due process rights, discussing *United States v. Nixon*:

> In *United States v. Nixon* (1974), 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039, President Richard Nixon sought to quash a subpoena seeking disclosure of certain materials in his possession which he claimed were protected by an absolute executive privilege. The President contended the privilege was based on the need for confidentiality of high-level governmental communications and on the doctrine of separation of powers. The Court acknowledged the necessity and validity of executive privilege but held that the policies underlying the privilege could not sustain an absolute immunity from judicial process. In reaching its conclusion, the Court noted that the Constitution "guarantees that no person shall be deprived of liberty without due process of law. It is the manifest duty of the courts to vindicate [this] guarantee [ ], and to accomplish that it is essential that all relevant and admissible evidence be produced. * * * [T]he allowance of the privilege to withhold evidence that is demonstrably rele-

**6.** *See also People v. Harlacher,* 262 Ill.App.3d 1, 199 Ill.Dec. 527, 634 N.E.2d 366, 372 (1994) (holding that defendant was not entitled to counseling records because he had not shown that they were material).

vant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts." *Nixon*, 418 U.S. at 711–12, 94 S.Ct. [at] 3109–10, 41 L.Ed.2d at 1066.

*Id.* at 353, 118 Ill.Dec. 18, 521 N.E.2d 86.[7]

In *Pinder*, the Florida District Court of Appeal held that, to obtain *in camera* review of information subject to the sexual assault counselor-victim privilege, "a defendant must first establish a reasonable probability that the privileged matters contain material information necessary to his defense." 678 So.2d 410, 417 (Fla.Dist. Ct.App.1996). *Pinder* had merely alleged that the victim had spoken to counselors, and the court found that this was not a sufficient showing to overcome the privilege. *Id.* at 416–17.[8]

In *Gomez*, the defendant, who was charged with rape, sought the victim's records from the Rape Crisis Center, which were privileged according to statute. 63 P.3d 72 (Utah 2002). The defendant argued that, pursuant to *Ritchie*, due process required disclosure of the records. The Utah Supreme Court held that *Ritchie* did not control because Utah's victim-sexual assault counselor privilege was absolute. *Id.* at 76. Other than his assertion that *Ritchie* applied, Gomez did not adequately brief his constitutional arguments, so the Utah Supreme Court did not address them further. *Id.* at 78.

We find the analysis of *Ritchie* in *Wilson*, *Turner*, and *J.G.* to be inadequate; therefore, we decline to follow those cases. The remaining cases cited by Crisis Connection lend little support to its position. In *Gomez*, the defendant relied solely on *Ritchie*, which the court correctly observed was not controlling. *Id.* at 76. *Gomez* did not reach the issue left undecided by *Ritchie*—whether an absolute privilege must yield to the Sixth Amendment—because the defendant had not adequately briefed the issue. The majority opinion in *Foggy* applied a case-sensitive analysis and determined that the defendant was not entitled to access to records on the facts of the case. The *Foggy* court relied on the fact that the defendant had made only a general request for the records. 118 Ill.Dec. 18, 521 N.E.2d at 92. Likewise, *Pinder* did not foreclose all possibility that privileged information might be disclosed, but held that the defendant had not shown that the information he sought was material or necessary for preparing a defense. 678 So.2d at 417. In contrast, here the trial court found that the records sought by Fromme "are sufficiently identified, may be essential for the Defendant in determining the credibility of the complaining witnesses, and may be material to the Defendant's defense." Appellant's App. at 17. Crisis Connection does not challenge these findings in its briefs.[9]

Several other states have determined that, regardless of the scope of their victim-advocate privileges, the privilege must

---

7. The plurality in *Ritchie* acknowledged that *Nixon* "suggests that the [Compulsory Process] Clause may require the production of evidence." 480 U.S. at 56, 107 S.Ct. 989.

8. The Florida District Court of Appeal is split as to whether *in camera* review is allowed. *State v. Famiglietti*, 817 So.2d 901 (Fla.Dist. Ct.App.2002), and *State v. Roberson*, 884 So.2d 976 (Fla.Dist.Ct.App.2004), both disagreed with *Pinder*. However, in *Famiglietti*,

one judge concurred in result because, although he believed the privilege was not absolute, he felt that the defendant had not made a sufficient showing to entitle him to the privileged information, and a second judge dissented, indicating that he agreed with *Pinder*.

9. At oral argument, Crisis Connection did indicate that it disagreed with the court's findings, but did not elaborate on this argument.

yield to a defendant's constitutional rights upon a sufficient showing by the defendant. In *People v. Stanaway,* the Michigan Supreme Court addressed a Sixth Amendment challenge by two defendants—Stanaway and Caruso—to Michigan's victim-sexual assault counselor privilege. 446 Mich. 643, 521 N.W.2d 557 (1994), *cert. denied.* The court stated, "Evidentiary rules must be evaluated when applied for a determination whether the interests served justify the potential limitation imposed on a defendant's constitutional rights." *Id.* at 568 (citing *Rock v. Arkansas,* 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).[10]

> Absolute privileges—privileges providing that information is not to be disclosed to anyone—have been abrogated despite the existence of the government's privilege to withhold disclosure of the identity of an informant where disclosure was compelled to satisfy the defendant's Sixth Amendment confrontation rights. "[N]o fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro* [*v. United States,* 353 U.S. 53, 62, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957)[11]].

> Common-law and statutory privileges may have to be narrowed or yielded if those privileges interfere with certain constitutional rights of defendants. See, e.g., *Davis, Ritchie, Roviaro,* ... and *Nixon, supra* (even the executive privilege afforded the President must yield

to due process demands in the administration of criminal justice)....

*Id.* at 570 (some citations omitted).

The *Stanaway* court concluded, based on its review of its own precedent and the jurisprudence of other states, "coupled with a prudent need to resolve doubts in favor of constitutionality," that a trial court must conduct an *in camera* review of privileged information if the defendant "has a good-faith belief, grounded on some demonstrable fact, that there is a reasonable probability that the records are likely to contain material information necessary to the defense." *Id.* at 574.

The court noted that Stanaway had merely asserted that the victim may have made inconsistent statements, and he acknowledged that he had no reason to believe that was the case. The court concluded that he had made an insufficient showing to warrant an *in camera* review because "[t]his need might exist in every case involving an accusation of criminal sexual conduct." *Id.* at 576. Caruso, however, had shown a good-faith belief that "the complainant suffered sexual abuse by her biological father before this allegation of abuse, the nonresolution of which produced a false accusation, and factual support for some sexually aggressive behavior, namely, writing a letter to her mother's live-in boyfriend inviting him to have sex with her in his car." *Id.* at 576–77. The court concluded that this was likely a sufficient showing, but remanded with instructions to the trial court to make specific findings.

In *Schaefer v. State,* the Alabama Court of Criminal Appeals held that information

---

**10.** In *Rock,* the Supreme Court held that Arkansas's *per se* rule prohibiting all post-hypnosis testimony violated the defendant's right to testify in her own defense. 483 U.S. at 62, 107 S.Ct. 2704.

**11.** *Roviaro* made this statement in the context of determining when the government must disclose the identity of a confidential informant.

subject to the victim-counselor privilege should be reviewed *in camera* :

> In this state, where a party's right of discovery has come into conflict with a communication that is the subject of a statutory privilege communication, the courts have decided the issue on the facts of each particular case or, in other words, on a case-by-case basis. The reasons for confidentiality must in each case be weighed against the defendant's right to bring to the jury's attention facts affecting witness's credibility. Access to such records must be left to the discretion of the trial court, which is better able to assess the probative value of the evidence contained in the records as it relates to the particular case before the court, and to weigh that value against the interest in the confidentiality of the records. In order to determine whether the records contain exculpatory or impeachment evidence that should be disclosed, the trial court of necessity must examine the records. That examination should be in camera.

676 So.2d 947, 948–49 (Ala.Crim.App.1995) (citations omitted).

The Montana Supreme Court also used a balancing test in *State v. Duffy,* 300 Mont. 381, 6 P.3d 453 (2000). Duffy was accused of having his daughters perform oral sex on him. He sought disclosure of the girls' medical, psychiatric, psychological, and counseling records. The trial court reviewed the records *in camera* and gave Duffy one redacted page. On appeal, Duffy argued that defense counsel should have been allowed to review the records. The Montana Supreme Court held that the *in camera* review was sufficient to protect Duffy's rights:

> [T]he district court must balance the defendant's need for exculpatory evidence against the privacy interest of the victim. To balance the relative interests of the defendant and the victim, the district court should review the confidential records in camera.... If confidential information is not exculpatory or necessary for the preparation of the defense, defense counsel's right to review the information is out-weighed by the victim's right to confidentiality.

*Id.* at 458. *See also State v. Peseti,* 101 Hawai'i 172, 65 P.3d 119, 128, 134 (2003) (holding that trial court has discretion to weigh defendant's need for privileged information and victim's statutory right to assert the privilege, and that *in camera* review of victim's CPS file satisfied defendant's right to due process); *Commonwealth v. Dwyer,* 448 Mass. 122, 859 N.E.2d 400, 415, 418–19 (2006) (subpoena for confidential information from a third party may be obtained if it is relevant, not otherwise available, the party seeking the information cannot properly prepare for trial, and the information is sought in good faith; after notice and a hearing for the custodian of the records and the subject of the records, the records may be reviewed by defense counsel under a protective order, which may be modified for a specific, need-based reason); *In re Robert H.,* 199 Conn. 693, 509 A.2d 475, 484 (1986) (upon a showing that there are reasonable grounds to believe that failure to produce confidential information is likely to impair the defendant's right of confrontation, victim's testimony will be struck unless victim consents to *in camera* review for material information); *Advisory Opinion to the House of Representatives,* 469 A.2d 1161, 1166 (R.I.1983) (court reviewed two variations of proposed victim-counselor privilege, one that was absolute, and one that contained an *in camera* review procedure; court opined that the absolute privilege would violate defendants' Sixth Amendment rights, but that the other variation "strikes the requisite balance between an accused's constitutional right at trial and

the sexual-assault victim's need for confidentiality").[12]

We believe that *Stanaway* and the other cases allowing for *in camera* review upon a sufficient showing of need are better reasoned than *Wilson, Turner,* and *J.G.* Furthermore, we find that *Stanaway* and the other cases with similar reasoning more closely resemble the approach that Indiana has applied to other privileges.

## C. Indiana Precedent Addressing Other Privileges

In *Rubalcada v. State,* the Indiana Supreme Court addressed whether the Sixth Amendment entitled the defendant to confidential criminal intelligence information.[13] 731 N.E.2d 1015 (Ind.2000). Tommy Rubalcada was charged with conspiracy to commit robbery and the murder of Brian Jamison. Rubalcada issued subpoenas *duces tecum* to several law enforcement agencies, seeking intelligence reports concerning Jamison. The agencies provided to the trial court fifty-five pages of intelligence reports and one audiotape, which indicated that Jamison was involved in illegal drug transactions. The trial court reviewed the information *in camera* and ordered that five pages be disclosed to the defendant. On appeal, Rubalcada argued that the trial court violated his rights to confrontation, compulsory process, and due process by allowing him access to only five pages of the reports.

As to the right of confrontation, the court stated, "The Confrontation Clause . . . is not a constitutionally compelled rule of pretrial discovery," citing the plurality opinion in *Ritchie. Id.* at 1021 (citing *Ritchie,* 480 U.S. at 52, 107 S.Ct. 989). Nevertheless, the Court reviewed the quality of cross-examination that Rubalcada was afforded:

> The record is clear that Jamison was involved in illegal drug transactions and that many of the State's witnesses' relationships with Jamison centered on these illegal drug transactions. In fact, the State presented much of this evidence. . . . The defendant's cross-examination was not limited because he lacked [information from the intelligence reports], and he was able to adequately address the relationship between the witnesses and Jamison, including their involvement in illegal drug transactions.

731 N.E.2d at 1021.

Regarding Rubalcada's compulsory process claim, our supreme court followed *Ritchie's* lead and addressed it as a due process issue. The court noted that Rubalcada was entitled to exculpatory and impeachment evidence in the government's possession, but that the trial court had not made explicit findings as to whether any of the criminal intelligence information was material or had impeachment value. Therefore, our supreme court reviewed the excluded information to determine whether there was "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* Conclud-

---

**12.** To date, Rhode Island has not enacted a victim-sexual assault counselor privilege. *See* http://www.rainn.org/public-policy/sexual-assault-issues/confidentiality-laws (state-by-state analysis of victim privileges compiled by the Rape, Abuse & Incest National Network).

**13.** Criminal intelligence information is confidential pursuant to statute:

> Criminal intelligence information is hereby declared confidential and may be disseminated only in accordance with section 7 of this chapter, and only if the agency making the dissemination is satisfied that the need to know and the intended uses of the information are reasonable and that the confidentiality of the information will be maintained.

Ind.Code § 5–2–4–6.

ing that there was not, our supreme court found no due process violation. *Id.*

We do not believe that our supreme court intended to treat the plurality opinion in *Ritchie* as dispositive of the confrontation clause issue, especially since the court did review the quality of confrontation that Rubalcada was afforded. As to the due process issue, *Rubalcada* is not directly on point because, unlike in Fromme's case, the confidential information was in the government's possession.

■■■■■■■ Fromme argues that our decisions apply a three-step analysis to determine whether information is discoverable in a criminal case, regardless of whether that information is privileged. *See Williams v. State,* 819 N.E.2d 381 (Ind.Ct. App.2004). Williams was charged with committing rape and criminal deviate conduct against K.W.M. Williams sought K.W.M.'s prescription records from Walgreens, which are confidential pursuant to Indiana Code § 25–26–13–15.[14] The trial court denied Williams' discovery motion. On interlocutory appeal, we outlined a three-step analysis for determining whether information is discoverable in a criminal case:

> (1) there must be a sufficient designation of the items sought to be discovered (particularity); (2) the items requested must be material to the defense (relevance); and (3) if the particularity and materiality requirements are met, the trial court must grant the request unless

there is a showing of "paramount interest" in non-disclosure.

*Williams,* 819 N.E.2d at 385 (quoting *In re WTHR–TV,* 693 N.E.2d at 6).

We held that the particularity requirement was met because "Williams's request for K.W.M.'s prescription drug records from an identified Walgreens store for the past three years ... allows Walgreens to identify what Williams seeks and allows the trial court to determine whether there has been sufficient compliance with the request." *Id.* at 386. The relevance requirement was met because "K.W.M.'s prescription drug records would provide insight on the medication she may have ingested the night of the attack," and the records related to "K.W.M.'s ability to accurately perceive and recount events." *Id.* at 387.

We then considered whether the State had demonstrated a paramount interest:

> The term [paramount interest] suggests that some fundamental and important stake is required to resist discovery. However, the depth of the interest in resisting may be no more than inconvenience if the need for it from a given source is minimal—for example, because it is readily available elsewhere without need to drag third parties into court. Whether a sufficient interest has been shown to prevent discovery "will depend upon the type of interest put forth" and "the category of information sought."

---

14. Williams also sought K.W.M.'s mental health records from St. Francis Behavioral Health. We held that Williams was not entitled to these records because he had not followed the applicable statutory procedures, which include notice and a hearing for the patient. *Williams,* 819 N.E.2d at 385–86; *see also* Ind.Code ch. 16–39–3 (titled "Release of Mental Health Records in Investigations and Legal Proceedings") and Ind.Code § 16–18–2–226 (defining "mental health records"). At oral argument, Fromme suggested that some of Crisis Connection's records may constitute mental health records; however, the record before us does not reflect whether the patients have been given notice and a hearing. As the issue has not been briefed and the record before us is inadequate, we decline to address whether Fromme would be entitled to any of Crisis Connection's records under the framework of Indiana Code Chapter 16–39–3.

*Id.* at 385 (quoting *In re WTHR–TV,* 693 N.E.2d at 7) (internal citations omitted). "Keeping information confidential may suffice as a reason to deny discovery...." *Id.* at 387.

Indiana Code § 25–26–13–15, which makes prescription records privileged, "indicates our legislature's desire to protect the confidentiality of prescription drug records in certain circumstances." *Williams,* 819 N.E.2d at 387. We concluded that the State had not shown a paramount interest in non-disclosure in Williams' case:

> The record indicates that Williams will defend himself, in part, on grounds that the events were consensual based on the couple's past romantic relationship and their particular sexual proclivities. In sexual assault cases, perception of events and credibility are crucial factors with the potential to significantly influence a fact-finder's determination. Access to information that would call into question such perception could affect Williams's ability to adequately defend himself and is paramount to K.W.M.'s confidentiality concerns as asserted by the State.

*Id.* at 388.

Crisis Connection argues that the three-step test applies only in cases where the information sought is not subject to a privilege. Crisis Connection argues that we decided in *Williams* that the pharmacist privilege did not apply. Indiana Code § 25–26–13–15(b) provides: "A person who has knowledge by virtue of his office of any prescription drug order, record, or patient information may not divulge such information except in connection with a criminal prosecution or proceeding or proceeding before the board, to which the person to whom the information relates is a party." In a footnote, the *Williams* court stated, "We decline the State's invitation to construe narrowly I.C. § 25–26–13–15(b)'s use of the word 'party' so as to encompass only Williams and the State.... [I]t is not clear that the legislature intended to exclude a complaining witnesses's prescription drug records from discovery...." 819 N.E.2d at 387 n. 6. We declined to hold that a victim was not considered a party; we did not explicitly hold the opposite, as Crisis Connection argues. Moreover, we clearly applied the three-step analysis in the body of the opinion.

At oral argument, Crisis Connection also argued that *State v. Pelley* supports its contention that the three-step analysis does not apply when the discovery sought is privileged. 828 N.E.2d 915 (Ind.2005). Crisis Connection appears to be referring to the portion of the opinion discussing *Jorgensen v. State,* 574 N.E.2d 915 (Ind. 1991). *Jorgensen* states:

> With respect to nonprivileged information, there are two principal questions which a trial court must consider in ruling on questions relating to discovery in a criminal trial: (1) is there a sufficient designation of the items sought to be discovered; and (2) are the items sought material to the defense? If the answers to both questions are affirmative, the trial court must grant the discovery motion unless the State makes a showing of paramount interest in nondisclosure. *Kindred v. State* (1989), Ind., 540 N.E.2d 1161, 1174 [ *(abrogated on other grounds by Fajardo v. State,* 859 N.E.2d 1201 (Ind.2007)) ].

*Id.* at 917. *Kindred* did not state that this analysis applies only to nonprivildged information, and neither *Jorgensen* nor *Pelley* appear to decide whether the analysis should apply to privileged information, and neither of those cases addressed whether a defendant's constitutional rights should

trump a statutory privilege.[15]

In contrast, our supreme court applied the three-step process in *In re WTHR–TV*. In that case, two news stations interviewed a sixteen-year-old girl accused of killing her daughter. The interview occurred while she was in jail and without the knowledge of her attorney. Defense counsel sought all news coverage relating to the alleged offense, including outtakes. The news stations resisted, claiming that they held a reporter's privilege under the First Amendment and Article 1, Section 9 of the Indiana Constitution.

Before deciding whether the information was privileged, the court set out the aforementioned three-step test. *In re WTHR–TV*, 693 N.E.2d at 6 (citing *Kindred*, 540 N.E.2d at 1174).[16] The court determined that some of the footage sought was not material, but that the defendant's request for her interview was sufficiently material and particular. *Id.* at 8–9. The court then determined that reporters were not entitled to special protection from discovery under the First Amendment. *Id.* at 15 ("It is hardly a novel idea that assertions of privilege must give way to a specific need for evidence in a criminal case."). Finally, the Court assumed without deciding that a reporter's privilege existed under Article 1, Section 9. On the facts of the case, the court concluded that the de-

fendant's request for her interview would not materially burden the stations' rights. *Id.* at 15–16.

We also have applied the three-step test in several cases where the discovery sought was privileged or confidential. *See Skinner v. State*, 920 N.E.2d 263, 265 (Ind. Ct.App.2010) (applying three-step test to information subject to attorney-client privilege); *Moore v. State*, 839 N.E.2d 178, 182–83 (Ind.Ct.App.2005) (applying three-step test to determine whether defendant could discover law enforcement's file on a confidential informant), *trans. denied; Sturgill v. State*, 497 N.E.2d 1070, 1072 (Ind.Ct.App.1986) (State failed to show paramount interest in non-disclosure of confidential welfare department files); *Duckworth v. Williams*, 494 N.E.2d 368, 370–71 (Ind.Ct.App.1986) (instructing trial court to conduct *in camera* review of records deemed confidential by the Department of Correction and to balance the DOC's interest in privacy against inmates' interest in using the records in parole hearings).

The State has a strong interest in fostering the relationship between victims and advocates, and we do not doubt that confidentiality is important to that relationship. However, the scope of the victim-advocate privilege is far broader than

---

**15.** In *Pelley*, the State sought to discover counseling records concerning the defendant and his family. In *Jorgensen*, the defendant was accused of murdering her husband, but there was evidence that Gary Cochran may have been the murderer. The trial court denied Jorgensen's request to depose Cochran's counselor and psychologist. Our supreme court reversed, because some of the information might have fallen within the "homicide" exception to the psychologist privilege, and no party had cited a privilege applicable to the counselor. *Jorgensen*, 574 N.E.2d at 917.

**16.** The court gave the following description of the test's origin:

This test originated in *Dillard v. State*, 257 Ind. 282, 274 N.E.2d 387 (1971), decided shortly after the Trial Rules came into force in 1970. The relevance and particularity requirements have not been amended since the Rules were enacted. Although most cases applying the *Dillard* test have involved discovery requests propounded to the State, the *Dillard* criteria have also been applied to discovery demands made to third parties in criminal cases. *See, e.g., Jorgensen v. State*, 574 N.E.2d 915 (Ind.1991).

*In re WTHR–TV*, 693 N.E.2d at 6 n. 4.

other privileges founded on similar concerns. The psychologist-patient privilege, for example, is subject to several exceptions, including "[t]rials for homicide when the disclosure relates directly to the fact or immediate circumstances of said homicide," and "[c]ircumstances under which privileged communication is abrogated under the laws of Indiana," which would include the constitution. Ind.Code § 25–33–1–17. *See also* Ind.Code § 25–23.6–6–1 (matters communicated to social workers acting as marriage or family counselors are privileged, subject to similar exceptions). In addition, the privilege victim-advocate applies not only to counselors, but also to volunteers acting in any capacity and participants in support groups, making it broader than even the so-called "absolute" privileges that received judicial approval in Colorado, New Jersey, and Pennsylvania. *See* Colo.Rev.Stat. § 13–90–107; N.J. Stat. Ann. § 2A:84A–22.15; 42 Pa. Cons.Stat. Ann. § 5945.1. Indiana's victim-advocate privilege would seemingly apply even if a complainant flatly told a person volunteering in some nominal capacity that she had fabricated the allegations. The policy behind the victim-advocate privilege does not support such an illogical result.

■ While the State undoubtedly has an important interest in protecting the victim-advocate relationship, a defendant's rights guaranteed by the Sixth Amendment are also of great importance. *See Nixon,* 418 U.S. at 713, 94 S.Ct. 3090 ("We conclude that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the generalized interest in confi-

dentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice. The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial."). The need to discover exculpatory evidence and effectively cross-examine witnesses is especially apparent in sex offense cases, which often hinge on witness credibility and which carry heavy potential penalties. The State clearly has a constitutional obligation to turn over to defendants material exculpatory evidence in its possession. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). There is no *Brady* violation here, because the information Fromme seeks has never been in the State's possession. *Williams v. State,* 808 N.E.2d 652, 665 (Ind.2004). Nevertheless, the State has, by statute, prevented Fromme from receiving potentially exculpatory information by making certain evidence categorically unavailable to him. We cannot agree that because the State has made the information equally unavailable to itself that it has avoided conflict with the defendant's constitutional rights.[17]

■ When a defendant's constitutional rights are implicated, the legislature cannot shield potentially exculpatory evidence from all judicial scrutiny. *See Nixon,* 418 U.S. at 706, 94 S.Ct. 3090 (holding that the president's need for confidentiality of high-level communications, without more, could not "sustain an absolute, unqualified … privilege of immunity from judicial process under all circumstances"). While we acknowledge that the three-step test has not always been applied to privileged informa-

---

**17.** Of course, the exception would be if the victim advocate has made a report to DCS. In that case, both the prosecutor and the defendant would be entitled to access DCS's report. *See* Ind.Code § 31–33–7–5 (written DCS report is made available to prosecuting attorney); Ind.Code § 31–33–18–2(14) (report shall be made available to a person about whom a report has been made).

tion, we now conclude that it provides a useful framework for balancing the victim's interest in privacy with a defendant's constitutional rights. Even though Crisis Connection disputes that the three-step test is applicable in this case, it acknowledges that we have generally employed some sort of balancing test when applying privileges. *See* Appellant's Reply Br. at 13 (" 'In analyzing the nature and scope of any statutorily created privilege, the first step is to determine the specific interest or relationship that the privilege seeks to foster. Only by doing this can a specific claim of privilege be evaluated against the principle that the public is entitled to every person's evidence.' ") (quoting *Ernst & Ernst v. Underwriters Nat'l Assurance Co.*, 178 Ind.App. 77, 381 N.E.2d 897, 902 (1978)).

In Fromme's case, the trial court has already found that Fromme has met the particularity and materiality criteria, and Crisis Connection has not disputed those findings. The interest in privacy asserted by Crisis Connection, while important, is not strong enough to bar an *in camera* review of its records. Requiring defendants to meet the three-step test before obtaining an *in camera* review creates the proper balance between a criminal defendant's constitutional rights and an alleged victim's need for privacy. This approach is consistent with our decisions addressing other privileges and with the better-reasoned opinions of other jurisdictions. Therefore, we affirm the trial court's order.

Affirmed.

BAKER, C.J., and DARDEN, J., concur.